```
               UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION


UNITED STATES OF AMERICA              Case No. 1:11-mj-82

-v-                                   Grand Rapids, Michigan
                                      September 28, 2011
REED STANLEY BERRY,                   10:25 a.m.

          Defendant.                  HON. ROBERT HOLMES BELL
_____/


          PRELIMINARY HEARING AND DETENTION HEARING
        BEFORE THE HONORABLE HUGH W. BRENNEMAN, JR.
               UNITED STATES MAGISTRATE JUDGE




APPEARANCES:

For the Government:         Mr. Hagen Frank
                            Assistant U.S. Attorney
                            The Law Building - Fifth Floor
                            330 Ionia Avenue, NW
                            Grand Rapids, MI  49503
                            (616) 456-2404



For the Defendant:          Mr. Elias Muawad
                            Muawad & Muawad, PC
                            36700 Woodward Ave., Ste. 209
                            Bloomfield Hills, MI  48304
                            (248) 594-4700
```

2

I N D E X

WITNESSES - GOVERNMENT:                                    PAGE

Chris Hess

          Direct examination by Mr. Frank              5
          Cross-examination by Mr. Muawad             29
          Redirect examination by Mr. Frank           39

Sam Moore

          Direct examination by Mr. Frank             42
          Cross-examination by Mr. Muawad             59


WITNESSES - DEFENDANT:

None



EXHIBITS                                              IDENTIFIED

None

1          Grand Rapids, Michigan

2          Wednesday, September 28, 2011 - 10:25 a.m.

3          THE COURT:  The next matter is the United States

4   versus Reed Stanley Berry in 1:11-mj-82.  We are scheduled for a

5   preliminary hearing at this time as well as a detention hearing.

6          Defendant is present with counsel.  Are the parties

7   ready to proceed?

8          MR. FRANK:  The government is, your Honor.

9          MR. MUAWAD:  Defense is, your Honor.

10          THE COURT:  All right.  Fine.

11          Are we going to have the hearings on both of these

12   matters and, if so, can we take testimony simultaneously?

13          MR. MUAWAD:  Your Honor, the preliminary hearing,

14   we're going to waive that.

15          THE COURT:  Okay.

16          MR. MUAWAD:  I know that the issue really is

17   detention but I've talked to my client and we're going to waive

18   the preliminary hearing but the issue of detention is the one

19   we'd like some testimony on.

20          THE COURT:  All right.

21          Mr. Berry, do you understand your right to have a

22   preliminary hearing to determine probable cause in this matter?

23          THE DEFENDANT:  Yes, sir.

24          THE COURT:  You've had a chance to talk to your

25   attorney about this?

1               THE DEFENDANT:  Yes, sir.

2               THE COURT:  That's fine.  And you are waiving or

3    giving up your right to the preliminary hearing at this time; is

4    that correct?

5               THE DEFENDANT:  Yes, sir.

6               THE COURT:  Anybody threaten you or use any force or

7    duress or undue pressure or anything of that nature to make you

8    give up your right to the preliminary hearing?

9               THE DEFENDANT:  No, sir.

10              THE COURT:  All right.  Then I find that you know

11   what you're doing and that you are doing it voluntarily and the

12   matter will be referred to the -- remain outstanding until the

13   grand jury has a chance to consider it.

14              That leaves us with a detention hearing.  Please be

15   seated and we'll proceed with that at this time, and the

16   government may go ahead.

17              MR. FRANK:  Thank you, your Honor.

18              And because obviously the weight of the evidence on

19   the underlying count or underlying charge is something the Court

20   considers on the issue of detention, although I appreciate the

21   defense waiving the preliminary hearing I'm still going to go

22   ahead and call two witnesses and put a fair amount of testimony

23   in front of the Court as it pertains to detention.

24              Government calls Special agent Chris Hess, FBI.

25                CHRIS HESS, GOVERNMENT WITNESS, SWORN

5

1                         DIRECT EXAMINATION

2    BY MR. FRANK:

3    Q     You're a special agent with the FBI?

4    A     That is correct.

5    Q     How long have you been with the bureau?

6    A     Approximately eight years.

7    Q     Where are you assigned right now?

8    A     I'm out of the Detroit FBI office but I'm assigned to the

9    Kalamazoo Resident Agency.

10   Q     Before joining the FBI, did you have some law enforcement

11   experience?

12   A     Yes, I did.  I was a police officer in Pennsylvania for

13   approximately five years.

14   Q     And as part of your -- or rather in the performance of your

15   duties did you become familiar with the name Reed Stanley Berry

16   by December of 2009?

17   A     That's correct, I did.

18              The investigation began around the approximate time

19   of December 2009 during which time a CNN news story ran regarding

20   the increasing and ongoing problem of online or internet Islamic

21   extremists being used as a way to recruit, promote, and

22   distribute terrorist organization's media.

23   Q     How did that CNN story involve or rather draw the FBI's

24   attention to Mr. Berry, if at all?

25   A     During the CNN news story a particular user name that Mr.

1  Berry utilized was, in fact, highlighted, and it did show during

2  the broadcast that that particular user name was broadcasting

3  violent Jihadi videos that depicted violent attacks on what

4  appear to be US forces overseas.

5  Q     So then as a result or rather at least partially as a

6  result of this CNN story the FBI's attention was drawn to Mr.

7  Berry?

8  A     That is correct.

9  Q     During the course of the investigation what sort of

10  criminal investigative techniques were employed?

11  A     The extensive investigation resulted in a culmination of

12  numerous criminal investigative techniques to include but not

13  limited to sources, undercovers, interviews of other FBI counter

14  terrorism subjects, physical surveillance, and search warrants.

15  Q     These interviews of other subjects, are these other

16  subjects within the United States?

17  A     That is correct, other FBI divisions.

18  Q     And who were some of these people?

19  A     Other subjects such as Emerson Begolly and --

20  Q     And can you spell his name for the court reporter?

21  A     Emerson, E-m-e-r-s-o-n, last name Begolly, B-e-g-o-l-l-y.

22  Q     And where was he located?

23  A     He was actually located in the Western District of

24  Pennsylvania but was indicted recently for terrorism charges in

25  the Eastern District of Virginia.

1  Q      Okay.  Any other named investigative subjects?

2  A      Yes.  For instance, another indicted individual would be

3  Zachary Chesser, first name --

4  Q      Common spelling on Zachary?

5  A      That's correct.

6  Q      And how's he spell Chesser?

7  A      C-h-e-s-s-e-r.

8  Q      Okay.  And what's his status right now?

9  A      He was also indicted in the Eastern District of Virginia on

10  terrorism charges.

11  Q      And during the course of the investigation did one or both

12  of these people sit down and talk with the FBI about Mr. Berry?

13  A      That is correct, they both did, and both acknowledged their

14  close association with Mr. Berry as well as acknowledged the fact

15  that he was a prolific participant and contributor to numerous

16  Islamic Jihadi media websites and web forums.

17  Q      And then you also mentioned a couple of search warrants.

18  Those were search warrants issued by this Court?

19  A      That is correct.  The first one took place on March 9th,

20  2011, when a search was conducted of Mr. Berry's residence at

21  4603 Terra Lane in St. Joseph, Michigan.

22  Q      And that search warrant was issued based on a demonstration

23  of probable cause of what?

24  A      Based on probable cause that Mr. Berry was, in fact,

25  involved in subtitling efforts on behalf of terrorist

1   organizations and also web forums and websites that act as

2   conduits for those organizations to promote and distribute those

3   Jihadi media and propaganda.

4   Q     And did the execution of that search warrant -- which I

5   believe you said was in March of 2011 --

6   A     That's correct.

7   Q     -- did the execution of that search warrant result in the

8   seizure of digital media?

9   A     Yes, it did.  It resulted in a significant seizure, a large

10  volume of digital media from Mr. Berry's residence.

11  Q     And so when we say "digital media," we're talking about --

12  A     Computer media.

13  Q     So hard drives, collateral, peripheral devices --

14  A     That's correct.

15  Q     -- all that sort of thing?

16  A     That's correct, yes.

17  Q     And then the second search warrant, what was that for and

18  when was it issued?

19  A     The second search warrant was issued by Western District of

20  Michigan in May of 2011, and that was to Yahoo in order to obtain

21  digital media from Yahoo regarding Mr. Berry's Yahoo account.

22  Q     And did Yahoo comply with that search warrant in a timely

23  manner?

24  A     Yes, it did.  And it also resulted in a significant volume

25  of digital media.

1  Q     So what did the FBI do with all of this media that had been

2  seized from Mr. Berry's residence and that had also been provided

3  by Yahoo?

4  A     The FBI appropriately forwarded the digital media to the

5  FBI Detroit division where it was forensically exploited and

6  analyzed by the computer people at the FBI.

7  Q     And without going into too great a detail what did the

8  result of those forensics examinations indicate?

9  A     The results of those examinations did indicate that Mr.

10 Berry was, in fact, involved in Jihadi websites, web forums, was

11 a prolific and a contributor and participant in those websites,

12 and also spent significant efforts in subtitling Jihadi videos on

13 behalf of terrorist organizations and terrorist websites.

14 Q     When you say "terrorist organizations," are you talking

15 about organizations that include those that have been designated

16 by the US government as foreign terrorist organizations?

17 A     That is correct.

18 Q     And did the examination of the media, the digital

19 information, both stuff that came out of Mr. Berry's residence

20 and the stuff that was provided by Yahoo, did that result in the

21 acquisition or discovery of significant communications between

22 online communications between Mr. Berry and the subjects of these

23 other investigations?

24 A     Yes, it did.

25 Q     You'd already mentioned Begolly and Chesser.  Was Mr. Berry

1  in communication with any other subjects of FBI investigations in

2  this support of foreign terrorist organizations arena?

3  A     He was in contact with an individual from the FBI Baltimore

4  division.  He is a minor but he is -- he was arrested for

5  terrorism-related charges.

6  Q     And what's his status, this other individual, with respect

7  to his case right now?

8  A     He was indicted for terrorism related charges.  He is in

9  the process of possibly being transferred to adult status for

10  those charges.

11  Q     And for that reason his name has not been publicly

12  disclosed in a public forum?

13  A     That is correct.

14  Q     And then how about somebody known in the media as Jihad

15  Jane from Philadelphia?

16  A     We have investigative results that have determined that, in

17  fact, Mr. Berry was in communication with that individual via a

18  web forum known for Jihadi media.

19  Q     Now, back in March of 2011 when the search warrant was

20  executed, did Mr. Berry become aware of the investigation that

21  had been ongoing since December of 2009?

22  A     Yes, he was made aware.  As a matter of fact, he was

23  interviewed simultaneously by myself and another special agent.

24  Q     And in the course of that investigation you explained or

25  gave him some background on why you all had searched his house?

1  A      That's correct.

2  Q      Was he also provided with a copy of the search warrant

3  affidavit?

4  A      Yes, he was.  His defense counsel was given a copy at that

5  time.

6  Q      And that was an attorney other than Mr. Muawad, correct?

7  A      That's correct.

8  Q      Did Mr. Berry -- during your interview with him -- by the

9  way, was that a custodial interview?

10 A      No, it was not.  It was located at the Berrien County

11 Parole Office.  Prior to speaking with him we notified Mr. Berry

12 that he was -- if he did not want to speak with us we would

13 leave.

14 Q      But he went ahead and spoke with you?

15 A      That's correct.

16 Q      And without going -- again, keeping this fairly general

17 because this is all background on the issue of detention --

18 keeping it fairly general, did he make incriminating statements

19 during that interview?

20 A      He did, in fact, explain that he was involved in

21 manipulating Jihadi videos and subtitling -- English subtitling

22 efforts, yes.

23 Q      Did he make some disclaimer, if you will, about his

24 contacts with or his contacts with foreign terrorist

25 organizations?

1          MR. MUAWAD:  My only objection is it hasn't been

2    determined in the past with the names that have been mentioned

3    that they have contacts with foreign terrorism or organization.

4    He's mentioned three individuals, two adults and a minor, no

5    organizations.

6          So my objection is I don't mind him answering the

7    question but I'm asking to see if there was any contacts with

8    organizations in order for that question to be answered because

9    the three individuals do not show any contacts to organizations.

10          THE COURT:  I didn't understand that, if that's an

11    objection to the question or not.  It sounds like you objected

12    and then said you don't mind him answering the question.

13          MR. MUAWAD:  Well, there was nothing in the evidence.

14    He asked him a question about past organizations or statements

15    made by client about past terroristic organizations.  There's

16    nothing so far that the FBI agent has testified to regarding

17    that.

18          I don't mind him asking questions pertaining to if

19    he's contacted any prior organizations, not individuals, but as

20    far as the question is concerned because there's no foundation as

21    to whether or not terrorism organizations are involved, and I

22    don't think he can answer it.  That's all.

23          MR. FRANK:  I believe the agent's testimony was that

24    the forensic examination of the seized media indicated that he

25    had been actively supporting these organizations.

1          THE COURT:  Go ahead and ask the question again.

2   BY MR. FRANK:

3   Q     Although he made admissions about -- partial admissions

4   about some of the activity he had been up to, did Mr. Berry make

5   some disclaimer about having been in contact or having done

6   anything intentionally on behalf of foreign terrorist

7   organizations?

8   A     He mentioned that, yes, in fact, he was involved in the

9   English subtitling efforts but that he did not do that those

10  efforts on behalf of any particular organization; he did it on

11  his own.

12  Q     Now, the activity, what was Mr. Berry's status with respect

13  to the State of Michigan while he was engaged in the activity

14  that the FBI was investigating?

15  A     Mr. Berry at that point in time was on parole.  He was not

16  incarcerated previous to that.  But on March 9th as a result of

17  the investigative activity by the FBI the Berrien County Parole

18  Office did violate his status.

19  Q     And what role, if any -- I mean, what role, if any, did the

20  FBI play in, other than its investigation, play in that decision

21  by the State of Michigan?

22  A     The FBI had no role whatsoever.  We made it very clear

23  numerous times to the Berrien County parole personnel that, yes,

24  there was an ongoing investigation but whether or not they

25  decided to violate his parole status was completely up to them.

1   Q       So then as the weekend of 11 September of this year

2   approached what was the FBI's investigative status with respect

3   to Mr. Berry?

4   A       Obviously over the 9/11 weekend there was an increased

5   security posture around the nation.  FBI headquarters required us

6   to conduct 24/7 surveillance on Mr. Berry during that weekend.

7   Q       And so that underlying investigation was still very active?

8   A       That's correct.

9   Q       Was there a specific operational plan developed here

10  locally with the FBI for the surveillance of Mr. Berry over the

11  9/11 weekend?

12  A       Yes, there was, as is the normal course of procedure for a

13  surveillance operation such as this, an operational plan was

14  drafted and put into place.

15  Q       What were the basic parameters of that operation plan?

16  A       The parameters of our surveillance units were to, in fact,

17  surveill him and nothing more.  As a matter of fact, it was

18  briefed to the surveillance units that we were to avoid any

19  confrontation with Mr. Berry at all costs.  However, if a

20  surveillance unit was absolutely unable to get out of a

21  particular situation then Mr. Berry would be addressed

22  accordingly.

23  Q       When did that surveillance actually start?

24  A       Began on September 9th, 2011.

25  Q       What day of the week was that?

1   A      That was a Friday.

2   Q      And how were the -- how was the manning, if you will, of

3   the surveillance going to be conducted?

4   A      The manning as far as the shifts go were 12-hour shifts and

5   they ran from eight to eight.  In other words, Detroit FBI

6   personnel would take the 8:00 a.m. to 8:00 p.m. shift and then

7   the Grand Rapids personnel or the west side of the state, so to

8   speak, would take the 8:00 p.m. to 8:00 a.m. shifts.

9   Q      So then at eight o'clock in the morning on Friday the 9th

10  Detroit personnel started surveilling Mr. Berry?

11  A      That is correct.

12  Q      Were you given regular reports of how the surveillance was

13  going during the day on Friday?

14  A      Yes, I was, towards, I believe, the latter portion of the

15  day as well as through the evening of September 9th I was given

16  notifications via cell phone as to what had occurred.

17  Q      And were you yourself going to be responsible for one of

18  these night time surveillance shifts?

19  A      That is correct.  I was responsible for the September 10th

20  shift, 8:00 p.m. through the September 11th 8:00 a.m. shift.

21  Q      So Saturday night to Sunday morning?

22  A      That's correct.

23  Q      And was a Special Agent Sam Moore also assigned one of

24  these shifts?

25  A      That is correct.  He was assigned the night of the 9th of

1  September through the morning of September 10th.

2  Q      Friday night to Saturday morning?

3  A      That's correct.

4  Q      And was there a task force officer named Larry Dyksterhouse

5  assigned?

6  A      Yes, there was, to the same shift as Sam Moore.

7  Q      All right.  What kind of reports did you get from the

8  Friday day shift about what Mr. Berry was doing?

9  A      It was reported to me in general terms that Mr. Berry on

10  several occasions had attempted to approach, aggressively

11  approach surveillance units at which time they broke contact and

12  to avoid a confrontation.

13  Q      And by "aggressively approach," what was described to you

14  in these contemporaneous reports?

15  A      I believe there was he would walk, you know, with a purpose

16  directly at the vehicles that the surveillance individuals were

17  driving sometimes yelling at them, that sort of thing.

18  Q      Now, these vehicles, these units, can we assume they didn't

19  have like FBI emblazoned on the side of the vehicles?

20  A      That's correct.  They're unmarked, normal, plain-looking

21  vehicles.

22  Q      And the agents doing the surveillance weren't wearing any

23  FBI markings?

24  A      That's correct.

25  Q      During your shift, which would be the Saturday night to

1   Sunday morning shift, did you yourself have an incident with Mr.

2   Berry?

3   A      Yes, I did.

4   Q      Would you describe that to the Court?

5   A      Yes, I will.  Approximately 2130 hours or 9:30 p.m. on

6   Saturday night, which would be September 10th, it was myself and

7   two other special agents as well as a task force officer from

8   Benton Township Police Department that were conducting the

9   surveillance.

10            At that approximate time surveillance units visually

11  observed a maroon Ford Taurus back out of the driveway of the

12  residence known to be where Mr. Berry resided at 4603 Terra Lane.

13  Q      Then what happened?

14  A      Surveillance units observed from a distance as Mr. Berry or

15  the maroon Ford Taurus left the neighborhood and traveled east on

16  Marquette Woods Road and then he went to the intersection of

17  Scottsdale Road and made a left hand turn and traveled north on

18  Scottsdale Road.

19  Q      And when did you yourself pick up Mr. Berry?

20  A      I believe it was immediately upon his making a left hand

21  turn on Scottsdale Road and heading north.  I was traveling

22  behind him at a distance and observed him travel to the next

23  intersection which was the intersection of Scottsdale Road and M-

24  139.

25  Q      Then what happened?

1   A     The maroon Ford Taurus made a left hand turn on M-139 and

2   traveled north towards the I-94 area and Benton Harbor.

3                From there surveillance units observed him from a

4   distance.  At certain points on M-139 traveling north he would

5   travel at a high rate of speed, at one particular instance so

6   much so that we temporarily lost sight of Mr. Berry after he

7   turned into what appeared to be a residential area of Benton

8   Harbor.

9   Q     But you re-acquired him shortly after that?

10  A     Yes, that's correct, based on earlier reports and earlier

11  locations that Mr. Berry had frequented.  There was a location at

12  817 Thresher Avenue that we did do a drive-by shortly thereafter

13  and surveillance units actually observed the maroon Ford Taurus

14  parked unoccupied at that location.

15  Q     So then is it safe to assume that you and the other unit

16  parked somewhere on the street to keep an eye on that vehicle?

17  A     That is correct.  The other two special agents

18  strategically located themselves in positions where they could

19  possibly observe Mr. Berry traveling back to his residence.

20               Myself and a task force officer, because of the fact

21  there was a lot of foot traffic in the area, we decided to park

22  west of that location on Thresher Avenue.  I was parked on the

23  north side of the road facing west and the task force officer was

24  parked on the south side of Thresher facing east, essentially

25  right across the street from each other facing opposite

1  directions.

2  Q       And this is about 9:30-10:00 at night?

3  A       That's correct.

4  Q       Did you and the other surveilling officer see Mr. Berry

5  shortly after that?

6  A       Yes, we did.  Shortly thereafter the task force officer

7  advised that he observed Mr. Berry and two unidentified

8  individuals exit the address I mentioned previously.

9           The two unidentified individuals got into a small,

10  light-colored sedan and immediately traveled out of the parking

11  lot, which essentially was a vacant lot, with their high beams on

12  and stopped directly in front of the task force officer

13  illuminating him as he sat parked on the side of the roadway.

14  Q       Okay.  Then what?

15  A       Immediately thereafter Mr. Berry was observed walking

16  around the rear of the small, light-colored sedan and was

17  approaching the task force officer's driver's door area.  At that

18  point the task force officer decided to turn his lights on and

19  sped in an easterly direction on Thresher in order to avoid a

20  confrontation.

21  Q       Then what did you do?

22  A       Shortly thereafter, or immediately thereafter, rather, the

23  small white sedan traveled in a westerly direction past me on my

24  left and traveled at a high rate of speed to the next

25  intersection and conducted like a hasty U-turn and then began

1    traveling back towards me with their high beams on and again

2    illuminating me as I sat on the side of the roadway.

3    Q     Did you see Mr. Berry at about that time?

4    A     I did.  I quickly glanced in my left hand rear view mirror

5    and I saw Mr. Berry standing in the middle of Thresher Avenue

6    kind of taking notice to what the small sedan was doing, and when

7    he noticed what was going on he started to take steps in my

8    direction.

9    Q     And what did you do?

10   A     At that point I made the decision to turn my headlights on

11   and get out of the area to avoid a confrontation.

12   Q     All right.  Let's jump forward to the latter part of just

13   this past week specifically 21 and 22 September which I believe

14   was a Wednesday and a Thursday.  That prior weekend did the FBI

15   become aware of any indicators that Mr. Berry planned to travel?

16   A     Yes.  I believe the week prior we had been notified by FBI

17   decoders that he did, in fact, or he was, in fact, issued a US

18   passport, so indications were that he possibly was planning on

19   traveling overseas in the near future.

20   Q     And then some days after that was the FBI given any

21   notification about airline travel?

22   A     Yes, we were.  I believe it was on or about the 19th of

23   September the FBI again notified me as to Mr. Berry's travel

24   plans that were to leave out of Midway Airport on the 22nd of

25   September and transit through Detroit and then arrive, the

1   ultimate destination would be Heathrow Airport in London.

2   Q      Did you and your supervisory agent and I sit down and have

3   a conversation about how to handle this information and what to

4   do with it?

5   A      Yes, sir, we did.  Matter of fact, we through that

6   coordination it was determined at that time that once we

7   confirmed that Mr. Berry was, in fact, at his residence on Terra

8   Lane that you, Mr. Frank, would make a telephone call out of

9   courtesy to his defense counsel and inform him of not only the

10  travel plans but also that Mr. Berry was on a "no fly" list.

11  Q      Just for the sake of the record, the "no fly" list, what

12  effect does that have on a person's ability to travel by air in

13  the United States, in or from the United States?

14  A      An individual being on the "no fly" list it means that he's

15  not going to fly on an aircraft or get on any aircraft in the

16  United States.

17  Q      So, plain and simple, that's a show stopper?

18  A      That's correct.

19  Q      Is that something that an individual is informed of, the

20  fact that they've been placed on the list, are they informed of

21  that at any time prior to actually trying to travel?

22  A      No, not necessarily, no.

23  Q      Well, usually?

24  A      Usually, no.

25  Q      Was Mr. Berry, prior to my telephone call to Mr. Muawad, to

1   your knowledge was Mr. Berry informed that he was on the "no fly"

2   list?

3   A       No, he was not.

4   Q       And, incidentally, as a result of this information the fact

5   that the State Department had issued him a passport and the fact

6   that he had travel reservations out of the country, as a result

7   of that what did the FBI do with respect to the surveillance?

8   A       The FBI on the morning of the 22nd of September we did

9   confirm that Mr. Berry was, in fact, at home.

10   Q       What I mean, though, is there a break in surveillance

11   between the weekend of September 11th and this time period of 21-

12   22 September?

13   A       Yes.  Yes, as a matter of fact, there was, yes.

14   Q       Okay.  So then as a result of the information that he'd

15   planned to fly and that he had a passport, was surveillance

16   reinstituted?

17   A       Yes, it was.

18   Q       So I think you said it was on a Wednesday that the decision

19   was made to place a courtesy call to Mr. Muawad telling him about

20   the "no fly" list and the travel plans?

21   A       That's correct.

22   Q       What happened with respect to surveillance Wednesday night

23   of last week?

24   A       Wednesday night, I believe it was the 21st of September,

25   the visual surveillance observed Mr. Berry open the rear of the

1  maroon Ford Taurus and place what appeared to be some sort of

2  luggage item in the trunk of the car.

3  Q    And was it possible to maintain surveillance of Mr. Berry

4  all through Wednesday night into Thursday morning?

5  A    It was possible but I believe through Wednesday night there

6  was a point in time when surveillance units did lose contact with

7  him.

8  Q    When did the -- and you might have already testified to

9  this but, if so, please just do it again.  When did the FBI

10 reacquire Mr. Berry?  When was the FBI certain that they had him

11 in sight again?

12 A    I believe it was -- it was the morning of the 22nd which

13 was the day that Mr. Berry was scheduled to fly.  I believe it

14 was about 0900 approximately.  All surveillance units did, in

15 fact, confirm that Mr. Berry was located at his residence.

16 Q    What time was he due to leave, I believe you said it was

17 Midway in Chicago?

18 A    The flight was scheduled for approximately 1340 hours so

19 that would have been 1:40 in the afternoon.

20 Q    And were you present when the call was placed to Mr. Muawad

21 to tell him about this?

22 A    Yes, I was.  Myself and you, Mr. Frank, were located in

23 Washington, DC, on business.  I was present when you made the

24 initial call to the defense counsel and left a voice mail giving

25 him the information regarding not only the travel plans but also

1  Mr. Berry being on the "no fly" list.

2  Q     And were you present when Mr. Muawad called me back?

3  A     Yes, I was.  And, Mr. Frank, you indicated that Mr. Muawad

4  was the person to call and as a matter of fact advised that he

5  would reach out to Mr. Berry and pass on the message that he was,

6  in fact, on a "no fly" list and was most likely not going to fly

7  that day.

8  Q     Did Mr. Berry actually leave his home then after that and

9  go to Midway?

10 A     No, he did not.

11 Q     Were you one of the arresting officers just this past

12 Friday --

13 A     Yes.

14 Q     -- of Mr. Berry on the criminal complaint that's in front

15 of the Court now?

16 A     Yes, I was.

17 Q     After he was arrested did you give Mr. Berry the

18 appropriate Miranda warnings?

19 A     Yes, I did.

20 Q     Did he go ahead and talk to you?

21 A     Yes, he did.  After reviewing the FD-395 Advice of Rights

22 Form several times and going at length to make sure he understood

23 it, he made the decision to sign the form indicating that he

24 understood his rights and was willing to talk to us and answer

25 some questions.

1    Q      In that conversation did he make clear, if at all, that he

2    knew what the underlying investigation was about?

3    A      We explained it to him, and upon hearing about what the

4    warrant was all about it appeared that Mr. Berry became somewhat

5    irritated and he said he didn't recall ever doing anything like

6    that that resulted in his arrest.

7    Q      But in your conversation with him -- where was he arrested?

8    A      He was arrested at an intersection, Hollywood and Maiden in

9    St. Joe.

10   Q      St. Joseph, Michigan?

11   A      Yes.

12   Q      And that's about how far from the courthouse here?

13   A      I think it's a little more than an hour drive, maybe hour-

14   and-a-half.

15   Q      All right.  Was he fairly -- was he talking most of that

16   hour?

17   A      Yes, he was.

18   Q      In that conversation though did you touch on the underlying

19   investigation for his internet activities?

20   A      Yes, we did.

21   Q      And how familiar did he seem to be about the substance of

22   that investigation?

23   A      He initially started saying that we --

24   Q      All right.  We don't need to go into detail about what he

25   said --

1  A     Yes, sir.

2  Q     -- about that other activity, but what I'm after is how

3  familiar was he with the substance of that other investigation?

4  A     He was familiar with it because he had access to the

5  original affidavits for the earlier search warrants.

6  Q     Did he say anything about going back to that weekend of

7  9/11.  What, if anything, did he say about his knowledge

8  regarding the FBI surveillance?

9  A     When we initially said that the arrest warrant was as a

10 result of the, you know, backing up and towards the surveillance

11 agent, he said he doesn't recall backing up towards anyone.  If

12 he knew it was an FBI agent he wouldn't have done so.

13             THE COURT:  He would or would not have done so?

14             THE WITNESS:  He would not have done so.  I'm sorry.

15             But then as the conversation went on Mr. Berry

16 appeared to be getting more and more irritated and said, "You

17 guys suck at your job."

18 BY MR. FRANK:

19 Q     That's a direct quote?

20 A     Yes.

21 Q     All right.  Then what else did he say?

22 A     He said I knew it was you guys, I knew it was the FBI, you

23 all look the same.  I would take ambiguous turns.  You guys would

24 follow me.  I'd take a weird shortcut through a parking lot to

25 get somewhere.  You guys would follow me, et cetera.

1    Q      Did you talk to him about this international travel, this

2    flight to England that he had booked for Thursday, 22 September?

3    A      Yes, sir, we did.

4    Q      What did he say about that?

5    A      When asked if he had a return flight or any intention of

6    returning to the United States he said, no, I had no intention of

7    returning to this country.

8            Matter of fact, he said he wanted to just be with his

9    wife who is located in London, wanted to raise a family, wanted

10   to support them, possibly work, possibly become a student, and

11   through his wife possibly become a UK citizen.

12   Q      Through grand jury process did the FBI obtain the flight

13   records or rather the itinerary records related to that UK

14   flight?

15   A      Yes, we did, from Delta Airlines.

16   Q      And, in fact, that indicated that it was not a one-way trip

17   though, didn't it?

18   A      That is correct, it indicated that it was a round-trip

19   ticket.

20   Q      But he told you what about what he intended?

21   A      He said he had no intention of ever returning to the US.

22   Q      You mentioned that you and I were in DC when the call was

23   placed to Mr. Muawad?

24   A      Yes, sir.

25   Q      Did that involve sitting down and talking with this Emerson

1  Begolly from Pittsburgh?

2  A    Yes, it did, about that same exact time as a matter of

3  fact.

4  Q    And what did Mr. Begolly say about his online associations

5  with Mr. Berry?

6  A    Mr. Begolly indicated that they had a close online

7  association.  They spoke regularly.  And Mr. Begolly indicated

8  that Mr. Berry was well known and respected through online

9  internet Jihadi circles.

10 Q    And what did he say about Mr. Berry's activity with respect

11 to this subtitle to work on the videos?

12 A    Mr. Begolly indicated that Mr. Berry was well known and

13 respected for his subtitling efforts.  As a matter of fact, he

14 was wished well by other online individuals after he would

15 complete a subtitling project.

16 Q    What did Mr. Begolly say about Mr. Berry's knowledge about

17 the organizations that he was supporting or attempting to

18 support?

19 A    Mr. Begolly advised that it was known, that it was known by

20 everybody including Mr. Berry who these -- who these

21 organizations were and what they stood for.

22 Q    And, incidentally, this online activity, are these like

23 open forums?  I mean, is this something I can -- a forum I can

24 just Google and go jump on myself?

25 A    Many of them -- many of them are not.  Some of them are by

1   invite only or password protected.

2   Q     Did Mr. Begolly disclose any communication with Mr. Berry

3   about Mr. Berry wanting to leave the country?

4   A     Yes.  Mr. Begolly indicated at one point in time Mr. Berry

5   said to him that he wanted to travel to Somalia to go on vacation

6   and afterwards he made the "wink" symbol with the semicolon and

7   the parenthesis.

8   Q     As an FBI agent familiar with investigations of foreign

9   terrorist organizations, did this reference to going to Somalia

10  on vacation, wink, wink, did that mean anything in particular to

11  you or indicate anything special to you?

12  A     Yes, it did.  As a matter of fact, when Mr. Begolly was

13  asked what did Mr. Berry mean by the wink, he said, well,

14  indicated he wasn't going to Somalia on vacation.  And in

15  addition in my experience going to Somalia could possibly mean

16  going to participate in Jihad.

17  Q     Well, what's significant about Somalia, I guess that's my

18  question, other than maybe it's not the greatest vacation place

19  in the world?

20  A     Somalia is the known location of the al-Qaeda associated

21  group al-Shabaab.

22           MR. FRANK:  Nothing further, your Honor.

23           THE COURT:  Thank you.

24           Cross-examination?

25           MR. MUAWAD:  Thank you, your Honor.

1                       CROSS-EXAMINATION

2    BY MR. MUAWAD:

3    Q     Agent Hess, regarding the -- they kind of jumble around a

4    little bit -- but regarding the questioning in your vehicle from

5    the time you arrested him to the travel into Grand Rapids, you

6    had given him his Miranda rights, correct, under your FBI form?

7    A     Yes, we did.

8    Q     And you asked him some questions about travel; would that

9    be correct?

10   A     Yes, we did.

11   Q     And your understanding, if I'm correct, is he does have a

12   religious wife, maybe not a wife that he married through a judge

13   or through a priest, but a religious wife in England, correct?

14   A     Correct.

15   Q     You know her name, correct?

16   A     I do, yes.

17   Q     That's in your report, a report that I've seen the name of

18   the young lady in England?

19   A     I believe it may be, yes.

20   Q     All right.  And he was actually traveling to go be with his

21   wife; that's what he told you -- Mr. Reed -- correct?

22   A     That was, yes, that was what he desired to do.

23   Q     Right.  He never said to you, look, I'm leaving because I'm

24   running away from any criminal troubles I may have, or I'm

25   running away from the FBI.  He emphatically told you that he was

1    leaving to England to be with his wife and maybe start a new life

2    with her if he could, correct?

3    A     That is correct.

4    Q     All right.  Now, Mr. Berry did know about the investigation

5    into alleged allegations or allegations of terrorism, right,

6    before he was arrested?

7    A     That's correct.

8    Q     All right.  And prior to getting his air flight or during

9    the passport process there has been no indictments as you know of

10   for material support to a terroristic group, correct?

11   A     On Mr. Berry or --

12   Q     Right, Mr. Berry?

13   A     That's correct.

14   Q     And no complaint filed, correct?

15   A     That is correct.

16   Q     And he was free to leave the United States?  Other than the

17   "no-fly" zone he was free to leave the United States boundaries,

18   correct?

19   A     That's correct.

20   Q     And by way of background of Mr. Berry, he lives with his

21   father in St. Joseph, correct?

22   A     Correct.

23   Q     And his stepmother?

24   A     Yes.

25   Q     In fact, you had many conversations or some conversations

1  with his father about what's going on with Reed; am I correct?

2  A      Other FBI agents had, yes.

3  Q      Okay.  I'm sorry.  You have not but you're aware of

4  conversations that the FBI has had with his father in St. Joseph,

5  correct?

6  A      That is correct.

7  Q      Okay.  Going to the beginning of the questioning from the

8  U.S. Attorney, did you personally see the CNN video?  You saw

9  that personally?

10  A      I have, yes.

11  Q      And did you personally see Mr. Berry's -- what is it -- the

12  web, his e-mail or whatever you want to call it?

13  A      User name.

14  Q      User name?

15  A      Yes.

16  Q      You did.  Okay.  So you did not know at that point in time

17  that it was Mr. Berry, correct?

18  A      I don't believe I did.

19  Q      And was it when you were watching the CNN show was there

20  any connotation as to what that website or what that meant?

21  A      The actual website that was shown?

22  Q      Right.

23  A      The news report indicated that it was, like I said, an

24  increasing and ongoing problem for law enforcement agencies

25  because the terrorist organizations were using these websites as

1  recruiting tools as a way or means to promote their Jihadi cause.

2  Q      Right.  Then for some reason CNN showed Mr. Berry's website

3  information or web information; would that be correct?  If I'm

4  saying it wrong just let me know.

5  A      It showed his user name and --

6  Q      User name, correct.

7  A      -- what was shown on his particular page.

8  Q      But when they talked about or when it showed his user name

9  it didn't really have any specifics about what this user name was

10 doing other than the fact that they just showed the user name,

11 correct?

12 A      And the video that was shown on his page.

13 Q      All right.  Is it fair to say that as we sit here today and

14 prior to Mr. Reed being arrested he's never traveled to Somalia,

15 correct?

16 A      Correct.

17 Q      He's never traveled to the middle east, correct?

18 A      Not that I know of.

19 Q      And he has not been associated with in Michigan and in

20 person I'm going to say, not on the computer, associated in

21 person with any known terroristic groups, correct?

22 A      That is correct, in Michigan.

23 Q      All right.  Would you agree that Mr. Berry is kind of a

24 one-man show that what he's doing on the computer what he

25 believes or what you believe he's doing on the computer is just

1    Mr. Berry; that there's no conspiracy with anybody else?

2    A      I would believe that Mr. Berry is doing what he's doing for

3    various reasons although he has online contacts that are involved

4    in similar activity.

5    Q      Right.  And without getting too much into, you know, the

6    legalities of it, he never went and trained at a paint ball

7    training for terrorism, correct?

8    A      Not that I'm aware of, no.

9    Q      You don't have him supplying any computers or formulas for

10   poison chemicals or anything like that to any known terrorist

11   groups, correct?

12   A      Not that I'm aware of, no.

13   Q      So what he's doing is he's on the computer pretty much a

14   closet computer guy and he's going into these portals or Jihad

15   websites; is that pretty much what he has here?

16   A      That's correct.

17   Q      And you can't comment as to whether or not he's protected

18   by the First Amendment on that or not protected or whether it's

19   material support or not material support, correct?

20   A      Correct.

21   Q      All right.  The warrants, there were two warrants issued, I

22   believe one was for Yahoo accounts; am I correct?

23   A      Yes.

24   Q      And as we sit here today has there been any finalization or

25   determination from the Detroit FBI as to what all the Yahoo

1   messages or e-mails mean?  Have you gotten a formal report from

2   them at all?

3   A     The forensics are ongoing.  I believe they're almost

4   complete.

5   Q     And the first form was for his hard drive and his computer

6   and stuff like that?

7   A     That's correct, yes.

8   Q     Right.  Has there been any formalization of what is in that

9   hard drive?

10  A     Again, the forensics are ongoing.

11  Q     Okay.  And I believe Mr. Berry has been cooperative during

12  this whole investigation into possible terrorism issues, correct?

13  A     Correct.

14  Q     Other than the complaint, the allegations in the complaint?

15  A     That is correct, yes.

16  Q     I don't want to, you know, bypass that, but other than that

17  he's been pretty cooperative?

18  A     With exception to the surveillance incidence, yes.

19  Q     The surveillance incidence, okay.  And really, you know,

20  he's talked to you either you or other agents, correct?

21  A     On two occasions he's talked to me, yes.

22  Q     Talked to you.  You've been the only agent, okay.  Then

23  obviously there's been some conversations with his father,

24  possibly his stepmother --

25  A     Yes.

1  Q      -- and some other agents?

2  A      Yes.

3  Q      Okay.  All right.  So as we sit here today there's really

4  been no determination as to really what the information means as

5  far as his ongoings on the computer; would that be correct?

6  A      I'm sorry?

7  Q      As far as we sit here today there's really been no

8  determination made either in the form of an indictment or a

9  complaint as to what exactly -- what Mr. Berry was doing was

10 illegal?

11 A      The investigation is ongoing and, no, there has not been an

12 indictment thus far.

13 Q      Okay.  All right.  On your ride back up from St. Joseph to

14 Grand Rapids when you were talking to him and you gave him his

15 Miranda rights, he pretty much as far as -- is it Begolly, am I

16 saying that right, Mr. Begolly?

17 A      Emerson Begolly, yes.

18 Q      He kind of thought he was a nut cake, right?  Isn't that

19 what Mr. Berry said to you, he was a little nutty and --

20 A      Yes, he said he was not -- wasn't normal.

21 Q      Right.  Wasn't normal and then --

22        THE COURT:  I'm sorry, Counsel, could you clarify who

23 was saying what about whom?

24        MR. MUAWAD:  Thank you, your Honor.

25        THE COURT:  A lot of pronouns there but I need to --

```
 1              MR. MUAWAD:  No problem, Judge.
 2  BY MR. MUAWAD:
 3  Q     During your ride up from St. Joseph to Grand Rapids and the
 4  subject of Mr. Begolly came up, Mr. Berry had told you that he
 5  thought Mr. Begolly was nutty or had some mental issues; am I
 6  correct?
 7  A     I believe he said he was mentally unstable and he wasn't
 8  normal.
 9  Q     Okay.  And Mr. Begolly has been indicted in the district
10  federal court where he's at in Pennsylvania, if I'm correct,
11  western district?
12  A     Eastern District of Virginia.
13  Q     Oh, Eastern District of Virginia.  And he sat down with you
14  and Mr. Hagen and talked to both of you; is that correct?
15  A     That is correct.
16  Q     Okay.  And obviously in hopes of possibly getting maybe a
17  5K or a reduction in his sentence?
18  A     I don't know.
19  Q     Okay.  All right.  And you've also talked to another
20  person, am I correct, interviewed a minor or the minor was going
21  to possibly be charged as an adult?
22  A     I haven't talked to him, no.
23  Q     All right.  Aside from Mr. Begolly who else has the FBI
24  talked to regarding Mr. Reed and Mr. Begolly?
25  A     I mentioned Zachary Chesser.
```

1  Q      And Zachary Chesser has been indicted, right?

2  A      That's correct.

3  Q      Regarding Begolly and Chesser, were they doing something

4  more than just talking on the internet, do you know?  Do you know

5  what their charges are all about?

6  A      Mr. Chesser was indicted for material support in that he

7  was planning on going to Somalia to participate with al-Shabaab.

8  Q      So there was actually with Mr. Chesser a strong indication

9  that he was going to train in Somalia with a known terrorist

10  group?

11  A      As far as I know about the case, yes.

12  Q      Okay.  And Mr. Begolly, what about him?  What do you know

13  about the facts with him?

14  A      Mr. Begolly was indicted for, I believe, posting an

15  explosives type manual online.

16  Q      Right.  He did something more affirmative such as posting

17  that manual for, I would take it, for terrorist groups, for

18  radicals --

19  A      As far as I know about the case, yes.

20  Q      Yeah, for radicals to look at, okay.

21         The issue of Mr. Reed going to Somalia, do you know

22  what time frame that was?  Has it been recently that he was

23  talking about that?  If it was years ago that Mr. Reed was

24  talking about potentially going to Somalia?

25  A      I don't recall the date of the conversation, no.

1    Q    The date of the conversation with Begolly?

2    A    That's correct.

3    Q    Okay.  Was it within the last 12 months that you talked to

4    Mr. Begolly about Mr. Reed?

5    A    No, I talked to Mr. Begolly --

6    Q    Recently, right?

7    A    -- recently, yes.

8    Q    I'm sorry, I'm not making myself clear.  Regarding the

9    conversation of Somalia and Mr. Reed --

10   A    Yes.

11   Q    -- do you know when Mr. Reed had said that to Mr. Begolly

12   or when that conversation took place?

13   A    I can't recall when that conversation took place between

14   Mr. Berry and Mr. Begolly.

15   Q    All right.  And as far as you know as we sit here today

16   there was never any tickets purchased by Mr. Reed to Somalia,

17   correct?

18   A    That's correct, as far as I know, yes.

19   Q    All right.  I don't have any more questions at this point.

20   Thank you, Agent.

21   A    Thank you.

22              THE COURT:  Fine.  Thank you, Counsel.

23              Redirect?

24              MR. FRANK:  Just a couple, your Honor.

25                        REDIRECT EXAMINATION

40

1   BY MR. FRANK:

2   Q    Mr. Muawad asked if you would agree that -- or rather if

3   you agreed that Mr. Berry had been cooperative with the FBI's

4   investigation, and you had previously testified that he admitted

5   some of the conduct that's under investigation.

6          Based on the arc, what the investigation has

7   disclosed to you thus far, do you believe that Mr. Berry had

8   admitted fully what he was involved in?

9   A    No, I do not.

10  Q    Mr. Muawad brought up the fact that there's been no

11  indictment on this other conduct yet.  What were we in DC doing?

12  What was the main purpose of that meeting?

13  A    Talking to the upper echelon Department of Justice and FBI

14  headquarters personnel about moving forward with the prosecution

15  on Mr. Berry.

16  Q    Because in this sort of case does the U.S. Attorney need

17  approval from main justice to bring an indictment?

18  A    According to what you've told me, yes.

19  Q    And is that process ongoing?

20  A    Yes, it is.

21  Q    Mr. Muawad asked about Begolly and what Begolly was charged

22  with.  Based on the investigation do you know whether Mr. Berry

23  was aware that Mr. Begolly had been arrested?

24  A    Yes, I was aware that Mr. Berry was aware of the arrest,

25  yes.

1  Q      Was Mr. Berry aware of the arrest of Chesser?

2  A      Yes.

3  Q      And how about Jihad Jane?

4  A      Yes.

5  Q      In any of the communications that came off of his computer,

6  what concern, if any, did he express about the fact that these

7  people had been getting arrested?

8  A      I don't recall specifically at this time, however, he was

9  aware of the arrests.

10  Q      Did he communicate with someone about the fact that one of

11  the people arrested was someone he'd been in direct contact with

12  and engaged in this kind of activity with?

13  A      Yes, in fact, he said regarding Mr. Chesser he was the one

14  that initially invited Mr. Chesser to the Ansar forum.

15  Q      The Ansar forum, that's the first mention of that.

16  Briefly, what is that?

17  A      It's a Jihadi website, like I mentioned earlier, a meeting

18  place for like minded Islamic extremists around the world, and

19  sort of a conduit for terrorist media organizations to promote

20  and distribute their media and propaganda.

21              MR. FRANK:  No further direct, your Honor.

22              MR. MUAWAD:  No questions, your Honor.

23              THE COURT:  All right.

24              May this witness be excused?

25              MR. FRANK:  Yes, your Honor.

1           THE COURT:  All right.  Thank you.

2           THE WITNESS:  Thank you, your Honor.

3           THE COURT:  Please remain available.

4           MR. FRANK:  Thank you.

5           The government calls Special Agent Sam Moore, FBI.

6           SAMUEL MOORE, GOVERNMENT'S WITNESS, SWORN

7                        DIRECT EXAMINATION

8  BY MR. FRANK:

9  Q     And you're assigned to the Grand Rapids Residence Agency of

10 the FBI's Detroit Division?

11 A     That's correct.

12 Q     How long have you been in Grand Rapids?

13 A     Twelve years.

14 Q     And how long have you been with the FBI?

15 A     Twelve years.

16 Q     Prior to the FBI did you have any law enforcement or

17 military experience?

18 A     Yes.  I was an Army officer, an infantry officer and then

19 intelligence officer on active duty in Germany and Desert Storm.

20 Q     On the weekend of the 10th anniversary of September 11th,

21 2011, just a few weeks ago, were you assigned responsibilities to

22 surveill Mr. Reed Berry?

23 A     Yes, I was.

24 Q     What was the basic operational plan for that surveillance?

25 A     We were to maintain constant surveillance of him even if it

1    meant being burned or if he caught onto the fact that we were

2    surveilling him and to not lose him, and also we were not

3    supposed to have any contact with him physically or any

4    interaction with him.

5    Q     And I assume there was some briefing of all the agents who

6    were going to be involved in the surveillance over that weekend

7    before it commenced?

8    A     That's correct.  We had a meeting prior to it where we had

9    an operational plan briefing where it discussed the SOG, Special

10   Operations Group surveillance would be surveilling during the day

11   time hours.  We would have the evening shift.  And then the

12   shifts were broken down and who be covering that.

13          And during that time also the deadly force policy was

14   also read and gone over as part of the operation.

15   Q     What does that mean, the "deadly force policy?"

16   A     The deadly force policy for FBI agents is -- it states

17   under what circumstances we could use force that would be deadly

18   to another individual who's posing a threat to ourselves or other

19   agents or other individuals.

20   Q     So these were the rules about when you can draw and use

21   your side arms, that sort of thing?

22   A     That's correct.

23   Q     As part of this briefing were you provided general

24   background about why you were being required to surveill Mr.

25   Berry?

1   A     Yes.  We were given a general overview that he's the

2   subject of a terrorism investigation for -- international

3   terrorism investigation and that who he came in contact, what he

4   was doing during the 9-11 weekend was of concern to the highest

5   level from our own headquarters, and that we also -- he had had

6   previous history of resisting and having contact with officers,

7   law enforcement officers.

8   Q     So you were, at least in general terms, aware of his

9   criminal history?

10  A     Generally, yes.

11  Q     What shift were you assigned to for the surveillance?

12  A     I was the eight p.m. to eight a.m. shift on the evening of

13  Friday the 9th of September.

14  Q     Friday night to Saturday morning?

15  A     That's correct.

16  Q     And were you partnered with somebody for that surveillance?

17  A     There were three other members on our team.  There was

18  Agents Christina Kleinpaste, Dave Smith, and then Task Force

19  Officer Larry Dyksterhouse.  He's a Michigan State Police

20  Detective-Sergeant who's assigned to the Joint Terrorism Task

21  Force.

22  Q     And how long have you and Agent -- well, we'll call him

23  Sergeant Dyksterhouse been working together?

24  A     Approximately eight years.

25  Q     Before you started your shift Friday night did you get like

1  a turnover briefing from the daytime surveillance agents?

2  A     Yes.  The team leader for the special operations group,

3  Special Agent Roberta or Bobbie Bero had told us that not only

4  were they aware that Mr. Reed was aware that he was being

5  surveilled, that there had been a confrontation where he had gone

6  into a parking area and he had stopped his vehicle and he then

7  got out of his vehicle and made eye contact and came yelling at

8  one of the agents who had been doing the surveillance.

9           The agent was Special Agent Melanie Kersey.  She

10 broke contact in order to avoid any type of physical

11 confrontation, which is what we were told to do at that point.

12 Q     Just to make life easy for the reporter, Bero, is that B-e-

13 r-o?

14 A     That's correct.

15 Q     And how's "Kersey" spelled?

16 A     K-e-r-s-e-y.

17 Q     And so then that was the state of your knowledge about Mr.

18 Berry, the investigation, and what he'd been up to that afternoon

19 when you started your shift Friday night?

20 A     That's correct.

21 Q     Were you and Sergeant Dyksterhouse, were you in different

22 vehicles?

23 A     That's correct.

24 Q     But were you staying in radio contact the whole time?

25 A     That's correct, we're using our radios constantly.  They're

1    a constant live feed based type situation.  We're reporting what

2    our activities were and what Mr. Berry was going to be up to.

3    Q       Now you were the affiant for the complaint that Mr. Berry

4    was arrested on, correct?

5    A       That's correct.

6    Q       And before we get to the incident that you covered in your

7    affidavit, before that incident happened, were you made aware of

8    something that Mr. Berry did with Sergeant Dyksterhouse?

9    A       You mean that night of the surveillance?

10   Q       Yes.

11   A       Yes.  That's actually in the affidavit, I believe, where

12   the incident occurred where Task Force Officer Dyksterhouse had

13   followed him out of the area where his residence was and had

14   followed him up M-139 to another neighborhood where he had pulled

15   off and parked his vehicle and then had gotten out of his vehicle

16   and it was nighttime.  It was approximately -- it was after 9:30.

17              And he had hopped out of the vehicle and came running

18   at him yelling while he had eye contact with him.  Task Force

19   Officer Dyksterhouse radioed it, said I'm breaking contact and

20   pulled away, but he said he still saw Mr. Berry coming at him as

21   he was proceeding away, driving away.

22              In fact, he had driven over a curb and through a yard

23   to avoid the contact.

24   Q       So then for a moment there visual surveillance of Mr. Berry

25   was lost?

1  A      There had been two main breaks in the visual surveillance,

2  one was when he was leaving his residence and then after he was

3  heading back to his residence.  There were two times where there

4  were breaks in the actual surveillance that we re-established

5  them.

6  Q      Okay.  But what I mean is after Detective-Sergeant

7  Dyksterhouse took off there was a break and then did you re-

8  acquire him?

9  A      Actually, what happened was he broke off, and when I

10 realized that there might be a confrontation and that he was

11 breaking contact I then tried to pick up the eye and I then came

12 by that same road that they were on, and then I saw Mr. Berry on

13 the street and I passed by.

14 Q      Did you use the phrase "pick up the eye?"

15 A      Yes.

16 Q      Okay.  I assume that's an internal --

17 A      It's whoever has the main view or surveillance of the

18 target or the subject.

19 Q      All right.  So then you picked up the eye on him at that

20 point.  What happened?

21 A      It was just briefly for a moment I drove by at, you know,

22 normal speed through the neighborhood, and then there was a

23 series of exchanges of different people trying to maintain the

24 contact.

25               There were intermittent breaks of surveillance, for

1  lack of a better thing, because the neighborhood had a lot of

2  people out and about that night and there was concern of hurting

3  someone who might be out walking through the streets or anything.

4         But we saw the vehicle had remained in place.

5  Q    Let's jump forward then if you can in very wave top summary

6  without going, you know, through specific turns on specific

7  streets and distances, just kind of summarize that activity

8  briefly up to the point where you were behind Mr. Berry and he

9  was stopped in the road.

10  A    After 10:30 he was leaving the residence mosque that he was

11  at and then he was heading in the direction of his residence at a

12  high rate of speed, and Task Force Officer Dyksterhouse and

13  myself followed him.

14         Task Force Officer Dyksterhouse caught him first at

15  an intersection.  When Berry stopped at the intersection at the

16  stop sign Task Force Officer Dyksterhouse broke contact as Mr.

17  Berry continued and then because he thought he would have been

18  identified again so he said, okay.

19         So I followed through the stop sign then, maintained

20  the contact.  There were two turns made, it was Tilley Road and

21  then East Marquette Woods Road.  He came to a complete stop and

22  he sat there for approximately -- and it's an estimate -- three

23  minutes, turned his light off, lights off, and just sat there.

24         I maintained a distance approximately 50 feet because

25  I wasn't sure what he was up to or what he was going to do.  I

1   left my car running, left my headlights on.  He had shut his

2   down.

3               Task Force Officer Dyksterhouse came up behind me,

4   stopped.  We waited.  Shortly after he came up then Mr. Berry

5   then proceeded, he turned his lights back on, made a turn, and

6   then was heading -- we later established he was heading back to

7   his residence because he turned up Woodland Drive.

8               It was at Woodland Drive where I still had the eye,

9   and I thought it doesn't matter if I'm burned or not because

10  we're maintaining contact but I kept it at a distance.  He turned

11  up.  I followed behind.  It was at that point that Task Force

12  Officer Dyksterhouse radioed me, he said it looks like he's going

13  home.  He goes, you can break contact, it looks like it won't be

14  an issue.

15              I stopped and was actually looking to turn around and

16  I saw several cars were passing behind me, the lights of them,

17  when he hit is brakes, threw it in reverse.  I saw his reverse

18  lights coming at me and I saw he was accelerating in my direction

19  very quickly.

20  Q     Where was Task Force Officer Dyksterhouse at this point?

21  A     He had hung back so that way if there had been -- in order

22  to allow a maneuver in case there was any turns or anything else

23  done, and I had lost contact.  He could come and fill in.

24  Q     All right.  So then he was not in the immediate area then?

25  A     No, and he had had difficulty pulling in where I was at

50

1  because of where I was positioned in the road, I was more or less

2  blocking because I'd stopped right at the intersection of

3  Woodland and East Marquette Woods Road so it's kind of there.

4          He could have squeezed in but it would -- so he just

5  stayed in the general vicinity.

6  Q     All right.  Now, before we go into your perceptions of what

7  happened after those reverse lights came on, have you received

8  some unique training in tactical driving from the FBI?

9  A     I think it's only unique for law enforcement officers or

10 FBI, we go to what's called TEOC, it's Tactical Emergency

11 Operator's Course, where FBI agents are trained in using your

12 vehicles in ways that your average person doesn't need to or

13 isn't taught how to do.

14          You learn the limits of certain vehicles, front wheel

15 drive, rear wheel drive.  You're given obstacle courses that

16 you're gone through.  You do slalom-type things through that.

17 You learn how to maneuver curves at a higher rate of speed than

18 what people normally went.

19 Q     So then this is specialized driver training?

20 A     Exactly.

21 Q     When you saw -- let's go now then to where you're sitting

22 there, your lights are on, his lights are on, you're both stopped

23 on the road, correct?

24 A     That's correct.

25 Q     You saw his rear light -- or, excuse me, his back-up lights

51

1    come on?

2    A      That's correct.

3    Q      Then what happened?

4    A      Well, he came at me and he was kind of -- and I saw that he

5    was accelerating at a high -- and this is all split second.

6           In fact, one of the things I noticed was in

7    situations like that you tend to sometimes your mind will slow

8    things down.  He was coming at me at a high rate of speed.

9           And what made me realize that specifically was his

10   vehicle was -- when someone's backing they're trying to steer it,

11   they're doing over-corrections, and he was wobbling as he was

12   coming at me.  It wasn't a slow like backing up like he was just

13   going to come talk to me or something.  He was coming at me and I

14   saw the wobble because the lights were emphasizing that, and I

15   realized at that point he was trying to hit me.

16   Q      And so then you had a decision to make how to respond to

17   that, correct?

18   A      Exactly.  In the split seconds that I was deciding the

19   first thing that crossed my mind was I referred back to our

20   deadly force policy where he's coming at me with a vehicle and I

21   thought at that time this is one of those situations where do I

22   shoot, and because I carry an active gun when I'm on surveillance

23   and it actually crossed my mind initially is this one of these

24   where I shoot in order to eliminate that threat.

25          And then it's ironic I then thought of when I played

52

1   football I thought either way I'm going to end up probably

2   getting hit by the vehicle, and instead of taking the hit I

3   thought I might be able to shuck him by or come by.

4           So I accelerated hard, turned a hard left, and then

5   turned right into him in order to -- I wanted to be in a position

6   where if he did something as a follow-up move I was in a position

7   possibly to an advantage to address whatever follow-up action he

8   may do.

9   Q    Now, in this thought process, this decision, albeit a very

10  tight matrix, this decision-making matrix of yours, you said that

11  the thought came in your mind about how hard the hit was going to

12  be if he made contact with you?

13  A    Exactly.  And I thought that -- I thought to myself at the

14  rate, because having -- I've been in several accidents, and I

15  thought to myself there's going to be that initial blast that you

16  feel and I didn't want to have that where I'm stunned because of

17  his action, and then it would have been who responds next.

18          Because I was actually thinking at that point he's a

19  terrorism subject, he's had problems before, he's gone to

20  people's cars as far as coming up to address them aggressively,

21  and now he's at the point where he's coming at me with his

22  vehicle, and I really didn't know how far he was willing to take

23  it and so I was preparing for whatever would be the worst.

24  Q    And the part in your decision-making process where you're

25  actually asking yourself do I pull my weapon out, without going

1  into great detail is it, you as a dozen-year veteran of the FBI,

2  fair to say you received a significant amount of training in the

3  use of deadly force?

4  A    That's correct.  We receive it at the academy.  It's

5  constantly throughout our training.  We have classroom

6  instruction.  We have a firearms training simulator where you

7  have situations where you're reacting and you actually are

8  drawing a firearm.

9         And then you have an attorney who's there who's

10  grilling you -- it's an FBI attorney -- who's grilling you as to

11  why did you draw your weapon, why did you shoot, why didn't you

12  shoot, and you have to respond what was your reasoning and

13  rationale at that moment for doing that, and it's part of the

14  training in order to do that.

15         We also have situations at Hogan's Alley where we do

16  scenarios where you also have to justify what were the actions

17  that you were doing either way, and then additionally we also

18  have firearms training where we're given regular deadly force

19  briefings and any updates or cases and things like that that

20  apply to it.

21  Q    Now, that's after you're out in the field and you're a

22  full-fledged agent, right?

23  A    That's correct.

24  Q    How many times a year is that?

25  A    Firearms training at least quarterly.

1  Q    And these quarterly firearms sessions then it's not just

2  marksmanship training, it's also judgment training?

3  A    We do legal.  Every time is not specifically the deadly

4  force policy, but we have deadly force training, we have case

5  law.

6          There's different legal presentations that are done

7  that address issues that would be relevant to an agent especially

8  in regard to current case law issues that you're going to face.

9  Q    And again without going into -- without reciting from heart

10 the FBI's deadly force policy, is it fair to say that that

11 decision is pounded into FBI agents that drawing your weapon is a

12 very big deal?

13 A    Exactly, and that's at that moment that's why it was one of

14 those things where what clicked in my mind was one of the

15 scenarios we're given tied into our deadly force policy is

16 because you have to say that it was necessary and that you have a

17 reasonable belief that the person is going to use a deadly weapon

18 against you that will cause you either physical damage or cause

19 death.

20          One of the scenarios that we are specifically given

21 and have been given is someone using their vehicle as a weapon

22 against you in order to kill or hurt you.

23 Q    And this deadly force policy, that was specifically briefed

24 as part of the operational plan briefing before the surveillance

25 started?

1  A      That's correct.  We're required to have a deadly force

2  briefing in writing and also gone over every time we do an

3  operation, whether it's a search warrant, an arrest warrant, or

4  any type of operation similar to that.

5  Q      So then as part of your decision-making you thought about

6  whether it was necessary to pull your weapon and fire but instead

7  you decided that you might be able to get out of the way?

8  A      Minimize and maneuver away, correct.

9  Q      And describe that maneuver, the one that took you out of

10 his direct path in detail?

11 A      It was a -- I did a hard left with my steering wheel, I

12 spun it, and I accelerated hard, and then I realized I was facing

13 that way as he's coming by because my initial conception of it

14 was to get out of the way.

15         But then with that -- and it's pure reaction, it's

16 not like I thought it out, each step -- was to, okay, I want to

17 make sure I'm in a position where he doesn't have a tactical

18 advantage because I didn't know if he had a weapon or if he was

19 going to come out at me as he did the others at that point.

20 Q      And that maneuver, in fact, he did not make contact with

21 your vehicle as a result of that maneuver; is that correct?

22 A      That's correct.  In fact, we ended up where his vehicle was

23 here, he had maintained basically a straight line, and I was

24 pointed generally towards his direction and when we had actual

25 eye contact with each other at that point.

1  Q      Then what happened?

2  A      I paused for a moment.  I wanted to see if he was actually

3  going to take any further action.  His demeanor and mannerism, I

4  did not get the impression at that point, it looked like it

5  diminished rather than became more aggressive, so then I

6  proceeded on down to a stop sign.

7         He followed me, he was probably about a half-car

8  length behind, and he had his high beams as he was following me.

9  He wasn't -- he wasn't right on my tail but he was close enough

10  where his high beams were lighting up my vehicle and passenger

11  part.

12         And then I stopped at a stop sign, made a left away

13  from his residence.  He then went to the right more which is in

14  the direction of his residence.

15  Q      Well, based on the conduct that you described why didn't

16  you arrest him right then and there?

17  A      Our mission was to do surveillance and to monitor him.

18  That's one part of it.  The other part is I was under the

19  mistaken belief at that point in time that he had to clearly have

20  been identified -- I had to be clearly identified to him that I

21  was an FBI agent either with creds, lights, something, and that

22  had never been done.

23         And really I was focused more on the mission at that

24  time but I didn't think that it'd be something that could be

25  charged because of the fact that I thought he had to clearly know

1   that I was an FBI agent.

2          And at no point did I say to him "FBI" or did I have

3   anything light up that showed "FBI" so I did not think that until

4   later we had a conversation where it was discussed that -- and

5   that's my ignorance of that particular law.

6   Q    So even though you had not -- but going into this when he's

7   coming back at you, did you -- what did you think at that time

8   about whether he knew that you guys were all -- the surveillance

9   was being conducted by the FBI?

10  A    There had been -- when we'd gotten briefed the prior shift

11  had the surveillance team leader who we referred to, Bobbie Bero,

12  she made it clear that she said he knows we're onto him.

13         And additionally there had been search warrants

14  executed and there'd been other interactions with him, and I was

15  given the impression that he knew very well that he was being

16  surveilled by the FBI based upon -- and I don't know the case and

17  the details of all the things that happened but I was given the

18  impression that he knew very well the FBI was on him.

19         And even when we were following him it's not like he

20  called 9-11 and said to the police he was being harassed by

21  someone or anything like that.

22         He had actually gone through what we would call

23  surveillance detection routes.  He'd gone out of his way to try

24  to see who's following him and done things to see what's going

25  on, but yet there'd been no law enforcement or contact or

58

1  anything like that.

2          Instead, it's been -- it's a surveillance game that

3  goes on, and that's not meant in any derogatory way, it's just is

4  someone following me or not and he had done things specifically

5  to see that.

6          And in the realm of who would have been watching him

7  I think it would have been pretty narrow that he would have

8  thought it was anyone else, and that's my opinion.

9  Q    In your experience someone in his situation actively

10  confronting and escalating against the FBI, what effect did that

11  have on your assessment of the situation?

12  A    Well, when the lights went on there that's what came to my

13  mind which led to the deadly forces like he's coming at me as an

14  FBI agent, that's what I immediately -- it's not like -- there's

15  been surveillance we've done where someone's a civilian or

16  something and they might think someone was just maybe harassing

17  them or, you know, road rage instance like that.

18          I actually had stopped at that point anyways because

19  I was looking to break contact and turn around.  He had continued

20  some and then he stopped and came back and that's when I thought,

21  okay.

22          But the FBI part of it, he had known we had followed

23  him for quite some time.  There had been no indication to think

24  that he thought it was a criminal or someone else who was -- or

25  like a road rage incident.

59

1  Q     But in terms of your own assessment of this universe of

2  facts and its affect on your assessment of the severity of the

3  situation, the fact that he was confronting FBI, how did that

4  play in?

5  A     Well, that escalates it because he automatically, as an FBI

6  agent, it's not Sam Moore, the citizen that he's -- there's an

7  instant.  It's I'm in the role of serving the government and

8  that, to me, is a higher level because he's confronting a law

9  enforcement officer.

10 Q     Thank you.

11            THE COURT:  Cross-examination?

12            MR. MUAWAD:  Thank you, your Honor.

13                       CROSS-EXAMINATION

14 BY MR. MUAWAD:

15 Q     Besides the day of the interaction that led to the

16 complaint in this case, did you have any other interaction with

17 Mr. Berry prior to that date?

18 A     No, not that I know of.

19 Q     Was that the first date that you saw him personally --

20 A     Yes.

21 Q     -- during the surveillance?  Anything prior to that you

22 wouldn't really have any personal knowledge of, right?

23 A     That's correct, as far as in --

24 Q     Like the flight, like the attempted flight to England, what

25 he was doing, and all that stuff?

60

1  A      I was aware of that but --

2  Q      Okay.  And you knew that he was told not to go because he

3  was on the "no-fly" zone (sic), and you're aware that he did not

4  go or attempt to go, correct?

5  A      That's correct.

6  Q      All right.  Going to the day of the surveillance, it sounds

7  like the date prior to the date of the actual complaint he was

8  aware that -- at least you think he was aware that he was being

9  surveilled by somebody, right?

10 A      That's correct.

11 Q      No one came up to him prior to the date of the complaint

12 and says, hey, I'm the FBI, I'm surveilling you, or I'm police

13 officer and anything like that?

14 A      As far as I know no one identified themselves as FBI,

15 that's correct, or law enforcement.

16 Q      All right.  And the day of the incident it progressively,

17 would you say, got worse with his getting out of the car and

18 trying to see who was following him, or did he not do that the

19 day of the complaint, the day that you stated that he put his car

20 in reverse?

21 A      I can't say if it was progressively worse because I don't

22 know the full details on what happened in the parking lot with

23 the previous team.

24        I was radioed what was going on and I saw the after-

25 effect, and I know the task force officer's response by driving

1  through the yard, especially that night, because we had said to

2  be careful because we knew there'd be a lot of pedestrian

3  traffic.

4            Him driving through that yard was significant because

5  that's not something he -- that's not his personality or his

6  demeanor, so that -- so whether that's quite or not, I don't

7  know.

8  Q    Okay.

9  A    I can't say.

10 Q    What street were you on prior -- just prior to the incident

11 occurring, prior to his lights coming on and going in reverse?

12 Where were you located?

13 A    East Marquette Woods Drive was where I was before I made

14 the turn onto Woodland Drive.

15 Q    When you got onto Woodland Drive you would have been behind

16 Mr. Berry --

17 A    That's correct.

18 Q    -- would that be correct?  And about how many car lengths

19 would you have been behind him?

20 A    I'd say approximately three, three or more.

21 Q    Okay.

22 A    I actually was conservative on distance because he was

23 probably a little further away.

24            I'm big on making sure that when I do surveillance

25 not to be too close to the individual because it allows you to

62

1  react and see what's going on.

2  Q    What kind of vehicle were you driving?

3  A    I was driving a silver Buick LaCrosse.

4  Q    Any audio or video in that car?

5  A    Recording, you mean?

6  Q    Right.

7  A    No.

8  Q    And he was driving, what, a Taurus or a Ford?

9  A    1984, it was a maroon Ford Taurus.

10  Q    Okay.  And did you have a passenger with you or you were by

11  yourself?

12  A    I was by myself in the vehicle.

13  Q    And then as you turned onto Woodland, is it --

14  A    Yes.

15  Q    -- Woodland, did he immediately put his car into reverse or

16  were you on Woodland for some time before he put his car in

17  reverse?

18  A    I was actually on Woodland and then and I had stopped.  He

19  was still continuing and then his brake lights went on and then

20  he came back.

21  Q    Okay.  Can you describe Woodland?  Is it a residential

22  street?

23  A    It's residential.

24  Q    Is it a wide residential street?

25  A    I'd say it's wider than a lot of the older streets you'll

1  see here in Grand Rapids.

2  Q     Were there cars parked on both sides of the street?

3  A     I believe so, that there were cars on at least one side.

4  It was dark and, like I said, when the incident happened I'm

5  pretty sure there were some cars there.

6  Q     Woodland runs east-west, north-south?

7  A     North-south.

8  Q     And it's there's two lanes, north and south traffic, would

9  that be correct?

10 A     It's a residential road but, yeah, that's --

11 Q     Is it a residential road that has a divider between the two

12 roads or just one big street with cars parked down the side?

13 A     I don't think it has a divider.  Like I said, it was night

14 time but I don't recall.

15 Q     All right.  Would you say that the street was as wide as

16 this courtroom here?  What I mean, and I'm pointing to the sides

17 here, not --

18 A     You're talking wall to wall?

19 Q     Wall to wall, yeah.

20 A     Probably that's about right.

21 Q     Okay.  So when you saw the brake lights come on and --

22            THE COURT:  For future reference, this courtroom is

23 probably 22-1/2 to 23 feet wide.

24            MR. MUAWAD:  Okay.

25            THE COURT:  So we have a record.

1              MR. MUAWAD:  That's amazing, well, you know that.

2   Thank you, Judge, I appreciate it.

3   BY MR. MUAWAD:

4   Q    When he put the brake lights on did he immediately start

5   going into reverse or did he --

6   A    Brake lights.  The white lights came on --

7   Q    Okay.

8   A    -- and that's it.

9   Q    All right.

10  A    There wasn't any pause, sat there for a few minutes, and

11  then they turned on.

12  Q    Was he heading straight back --

13             THE COURT:  I'm sorry.

14             MR. MUAWAD:  Sorry, Judge.

15             THE COURT:  There was no pause, you said?

16             THE WITNESS:  There was -- other than the transition

17  of foot and brake it wasn't like there was a delay where we sat

18  there for a minute and then it came.  Brake lights came on, the

19  white back-up lights came on right after that.  It was

20  sequential.  It was almost immediate as far as --

21  BY MR. MUAWAD:

22  Q    Were you still three car lengths behind him when that

23  occurred?

24  A    It was at least three car lengths behind.

25  Q    Okay.  And there was, I would take it, there was enough

1   room for another car to be to your side?  Could there be another

2   car coming in the opposite direction passing you.  Was there

3   enough room for that?

4   A     I'm not sure of your question.

5   Q     Well, the street was big enough where if Mr. Berry's intent

6   was to go around you, could he have done that?  Was that street

7   that wide?  Instead of going and trying to hit you, could he have

8   gone around you?

9   A     Because I maneuvered out of the way, yes -- if, yes.  If

10  you're saying was there room for him if I stayed fixed if he

11  could have gone around?

12  Q     Right.

13  A     Yes, that's why I was able to maneuver out of the way.

14  Q     Did you maneuver out of there right away or did you wait

15  till he got a certain amount of feet before you decided to make

16  that maneuver?

17  A     I need you to qualify that a little better.

18  Q     When you made the maneuver to go forward and around him, I

19  think is what you testified earlier, did you do that immediately

20  when you saw him backing up toward you, or did you wait just to

21  see where he was going with the car?

22  A     Very difficult for me to say time-wise how it was because,

23  like I said, in the instantaneous thinking that's going on with

24  that and I saw him coming I had enough time to see that he

25  wobbled, and it was at the point that I realized he was coming at

1  me and he was wobbling and he wasn't turning is when I realized,

2  because there was a series of events.

3        When I saw that wobble I realized he's coming me, the

4  speed was -- he appeared to be accelerating at me.

5        At that point I realized that's when I went through

6  the mind of he's going to hit me.  Do I use deadly force because

7  that's one of the scenarios we're given.  And then what came to

8  my mind was I might be able to minimize the hit because I thought

9  I still might get hit on my rear end and that's when I

10  accelerated, turned hard, he came here, and I turned back in.

11        So to put a time on it I can't do that.  I'd be --

12  that'd be inaccurate for me to even say that because --

13  Q    When you saw --

14  A    -- it happened very quickly and in my mind things slowed

15  down because of what was going on.

16  Q    When you saw the car wobbling, would you say you were two

17  car lengths away, three car lengths away, one car length away?

18  A    It was probably at least two car lengths away.

19  Q    Okay.  And was there any indication that Reed was going to

20  be going around you but just in a reverse direction?

21  A    No, because his wobbles when he was doing corrections, they

22  were keeping him as if he was maintaining a straight line course

23  of action, not going in either direction.  I had enough time.

24  That's what made me reinforced me he's coming at me --

25  Q    Okay.

1  A      -- because of his acceleration and there's the wobble that

2  occurred.

3  Q      Okay.  And then did you, after making your maneuver did you

4  try to get out of your car when you went around him and talk to

5  him, or your mission was not to have any contact with him; is

6  that correct?

7  A      I said nothing to him and I did not get out of my vehicle.

8  Q      Did Mr. Berry stop after you went around him and get out of

9  his car in any way?

10 A      No, he did not, and I don't know if he would have been able

11 to because the way my car was positioned in proximity to his I

12 think his door may have been blocked by that.

13 Q      How long were you two side to side where his door was

14 blocked?

15 A      I'd say guessing --

16 A      Mm-hmm.

17 Q      -- a minute or two.

18 Q      Sure.  Okay.  During that minute or two was there any

19 conversation going on between you and Mr. Berry?

20 A      Nope, none.

21 Q      Okay.

22 A      No non-verbal exchange.

23 Q      Were you just sitting there?

24 A      We had eye contact.

25 Q      Okay.

1    A       Because I was waiting to see --

2    Q       Did he give you the finger or anything like that?

3    A       No, he did not.

4    Q       Okay.  So you guys were sitting there for a minute or two

5    minutes and then what did he do, he put his car in reverse and

6    left or you left the scene?

7    A       I then left.  I proceeded because I thought I was going to

8    again create distance and space because I was thinking our job

9    was not to have contact with him --

10   Q       Okay.

11   A       -- or to arrest him.  Our job was to keep distance, monitor

12   what he's doing so that --

13   Q       While you two were side to side in your cars he could have

14   gotten out of the passenger side, right, if he wanted to?

15   A       I would assume if the door's working probably.

16   Q       Right, if the door's working, yeah, the door's working

17   properly.  But he didn't.  He just stayed in the car a minute or

18   two minutes and then he goes forward or you left, you left the

19   scene?

20   A       I left the scene.

21   Q       All right.  And was there continued surveillance of Mr.

22   Reed after that?

23   A       Yes.

24   Q       Did he go home?

25   A       Yes.

1  Q      Okay.  There was no further contact with Mr. Reed, correct?

2  A      That's correct.

3  Q      Prior to this --

4  A      With my shift.

5  Q      Right.

6  A      That night until the morning at 8:00 a.m. there was no

7  other activity from that point on, that's correct.

8  Q      All right.  You're well aware that Mr. Reed had some

9  knowledge of an investigation going on into potential terrorist

10 activities --

11 A      Yes.

12 Q      -- prior to this incident with you, right?

13 A      Yes.

14 Q      And up until that time he really never did anything

15 forcibly against the FBI other than maybe come out -- other than

16 maybe come out on one of their surveillance and, you know, kind

17 of had some verbal exchanges with the FBI?

18 A      My understanding was that he had other surveillances where

19 they were burned, and I don't know if there were interactions or

20 not with that.  We were just advised to be careful with him based

21 on his previous law enforcement and then with what was going on

22 at the time.

23 Q      Okay.  Thank you very much.

24              THE COURT:  Redirect?

25              MR. FRANK:  No, your Honor.

Patricia R. Pritchard, Certified Electronic Reporter
(616) 364-4943

1           THE COURT:  Fine.

2           You may step down.  Thank you.

3           MR. FRANK:  Nothing else from the government, sir.

4           THE COURT:  Okay.

5           Evidence or proffer on behalf of the defendant.

6           MR. MUAWAD:  Your Honor, on the proffer, some of its

7   going to be coming from the pretrial services report.  It's just

8   background on Mr. Berry.  I'm sure you've read it.  Have you read

9   it yet or --

10          THE COURT:  I have read the pretrial services report.

11          MR. MUAWAD:  Okay.  Just want to confirm with the

12  Court that he at the time of this incident was living with his

13  father and his stepmother.

14          His father is a photographer, and I'm not too sure

15  what his stepmother does but he was -- Mr. Berry was collecting

16  unemployment, trying to find a job, was living in the St. Joe

17  area.

18          And if I'm correct from the time that he was released

19  from the parole violation to the time of this incident there'd

20  been no criminal activity.  He was not arrested for any state,

21  local criminal activity, if I'm correct.

22          THE COURT:  What period of time are you talking

23  about?

24          MR. MUAWAD:  Judge, I think it would have been --

25  excuse me, your Honor.  He was discharged from parole June 26th,

1    2011, if I'm correct.

2              THE COURT:  Okay.

3              MR. MUAWAD:  And my client's confirmed that with me.

4              He's had no contact.  He's tried to find jobs.  He's,

5    again, living with his father and stepmother in the area.

6              And other than that for background that's all.  We

7    can make our arguments regarding the elements for detention.

8              THE COURT:  All right.

9              MR. MUAWAD:  Thank you.

10             THE COURT:  Fine.  Thank you.

11             Closing?  Government?

12             MR. FRANK:  Yes, your Honor, thank you.

13             Your Honor, the United States concurs with the

14   recommendation of the probation office that Mr. Berry be

15   detained.

16             Turning first to the danger prong here.  Obviously

17   this is a crime of violence so danger to the community is a

18   permissible basis to detain.

19             We think that the evidence before the Court pretty

20   clearly describes just an outrageous situation where someone who

21   knew that he was the subject of a long-running terrorism,

22   international terrorism support investigation on the weekend of

23   9-11, knew he was under FBI surveillance, was so bold as to

24   openly confront those agents, run towards them, shout at them,

25   and escalate his conduct up to the point where he created a

1  situation where an FBI agent, with all the training that goes

2  into being an FBI agent with 12 years of experience and all the

3  training and judgment that one builds over a dozen years in the

4  FBI, that FBI agent had to consciously think about whether he

5  should pull his weapon and shoot Mr. Berry based on the situation

6  that Mr. Berry created.

7            That is an outrageously bold course of conduct on Mr.

8  Berry's and it's an outrageously dangerous situation that he

9  created.

10            Also his past record as summarized in the probation

11 report of a history of problems with law enforcement of resist

12 and obstruct and his parole violations.

13            Also the fact that while he was on parole from the

14 State of Michigan he engaged in the conduct that resulted in this

15 Court issuing two search warrants and that has resulted in him

16 being the subject of an ongoing FBI material support of

17 international terrorism investigation.

18            So we think that his past history and his conduct on

19 the weekend in question and the context of that conduct pretty

20 clearly demonstrates that he's a danger to the community and that

21 just releasing him and taking his passport and maybe putting him

22 on tether would be insufficient to ensure the safety of the

23 community.

24            On the issue of flight, again he knew he was the

25 subject of an ongoing investigation.  He knew from the affidavits

1   that he was provided with back in March of 2011 the basic

2   parameters of that investigation.  He knew that the FBI took

3   every shred of digital media that he had out of his house, and

4   also had gotten a complete dump from Yahoo of his Yahoo account.

5           So he knows that the FBI is in possession of the

6   universe of digital information that his course of conduct

7   created.  So he's got to know that he's in a fair amount of

8   trouble above and beyond the charge that's in front of this Court

9   and that gives him an incentive to flee.

10          Moreover, he bought, even though he knew he was the

11  subject of this investigation, as soon as he had that passport he

12  buys a ticket out of the country and he told the FBI agent that

13  as far as he was concerned it was a one-way trip; he was never

14  coming back.

15          Now, granted he told the FBI it's because he wants to

16  go to the UK and be with his wife that he's never laid eyes on.

17  Maybe so.  But we think --

18          THE COURT:  I'm sorry, you say he's never laid eyes

19  on his wife?

20          MR. FRANK:  I believe that's in the testimony as Mr.

21  Muawad brought out this was an internet -- I forget the exact

22  term used --

23          MR. MUAWAD:  Religious marriage.

24          MR. FRANK:  -- religious marriage or something.

25          THE COURT:  I heard that part but I didn't hear any

1   testimony that he'd never seen her before.

2            MR. FRANK:  Well, just to avoid mucking up the record

3   I'll make a proffer that -- I mean, I could put the agent back on

4   -- that he and his quote, unquote, "wife" have never physically

5   met.  The defense can stipulate to that or I could --

6            MR. MUAWAD:  That's true but in the religious Muslim

7   community it typically works out where sometimes they get married

8   in the religious part of it to somebody overseas and it takes

9   many, many years to get that person over there to actually live

10  with each other.

11           So for the proffer that's correct but not necessarily

12  -- well, you can -- I'll make my argument but that's true, he

13  never has met her personally but they've had many, many contacts

14  and they were under the Muslim community husband and wife.

15           THE COURT:  All right.

16           MR. FRANK:  So in any event he says he was going to

17  go, you know, live in the UK with his wife that he's never

18  physically met.  Maybe so.  But just as possibly maybe not.

19           We know that he communicated to Begolly, you

20  know, a wish to travel to Somalia -- wink, wink -- for vacation.

21  That's a source of concern.

22           But the bottom line is he knew that he's the subject

23  of an investigation.  He knew that he had been surveilled over

24  the weekend of 9-11 and he still makes this plan to take a one-

25  way trip to the UK.  Granted, he didn't know at the time that

1    that trip was never going to happen.

2              But the only reason he's not in the UK right now is

3    because he was on the "no-fly" list, and the only reason

4    apparently that he didn't get in the car and drive to Midway and

5    try and make the flight was because our office extended the

6    courtesy of making a call that would save him a wasted trip to

7    Midway in Chicago.

8              THE COURT:  The date of your call was what again?

9              MR. FRANK:  It was the morning of the 22nd of

10   September, your Honor, and he was scheduled to fly the afternoon

11   -- fly from Midway the afternoon of the 22nd.

12             So the issue of flight we submit has to be assessed

13   in the context of the larger case and the larger investigation,

14   and the bottom line is Mr. Berry knows that the FBI possesses the

15   universe of his digital activity, his online activity, because

16   we've got all of his computers, all of his peripherals, and his

17   Yahoo account.

18             And he knows how seriously this case is being taken

19   by the US government.  So that gives him an incentive.  Obviously

20   he's not going to be flying under his own name but Canada is not

21   that far away either.

22             So based on the evidence before the Court, your

23   Honor, we believe he should be detained; that there's no

24   condition or combination of conditions that would ensure his

25   presence at trial and the safety of the community.

1          For that reason the government believes by clear and

2    convincing evidence -- believes that it has demonstrated by clear

3    and convincing evidence that he's a danger and by preponderance

4    that he's a flight risk.

5          Thank you.

6          THE COURT:  Before you sit down, I want to direct

7    your attention to the last page, the second to the last page of

8    the pretrial services report which discusses the defendant's

9    criminal record.

10          There is a charge dated on the left hand column at

11   the very end, October 13th, 2005, delivery and manufacture of

12   marijuana.

13          Now, I'm following down on the right hand side the

14   various things that took place in regard to this.  In June of '07

15   the defendant is put on one year probation.

16          Two months later that probation was revoked and the

17   defendant is sentenced to 18 to 48 months in prison.

18          Then apparently he must have been paroled again

19   because in December of '08 the parole was revoked.  Pretrial

20   services didn't have the details on that.

21          In July of '08 the defendant's parole was revoked and

22   he was returned to prison again.  Presumably then he would have

23   remained in prison for all of '09, '10, up until the middle of

24   2011.

25          But some of the activity here suggests that he wasn't

1   in prison that entire period of time.  Do you know if there was

2   another parole after December of 2008 when his parole was revoked

3   and he was returned to prison?

4              MR. FRANK:  I do know, your Honor, and there was.  He

5   was released -- can I have a second, your Honor?

6              THE COURT:  Yes, please.

7              MR. FRANK:  I was just confirming and counsel also

8   helped me confirm, your Honor, that he came out of Michigan

9   Department of Corrections, or maybe it was the county jail, I

10  don't know, but he came out of custody in the summer of 2011 --

11  no, wait a minute.  I'm sorry.

12             MR. MUAWAD:  Your Honor, maybe I can help.  He was

13  violated -- the MDOC violated him for these alleged activities in

14  March of 2011, and revoked his parole and kept him until the date

15  they released him which was June 26, 2011.

16             MR. FRANK:  Right, but the Court's question, your

17  Honor --

18             THE COURT:  That's part of my question.

19             MR. MUAWAD:  Okay.

20             THE COURT:  But he must have been paroled at some

21  point after December of '08 so they could --

22             MR. FRANK:  That's right.

23             THE COURT:  -- otherwise they wouldn't have been able

24  to violate him in March of 2011.

25             MR. FRANK:  That's right.  He came out in -- and I

1   can't remember if it was spring or summer, I didn't bring my

2   entire file with me -- but it was spring or summer of 2009 he

3   came out again, and then because not long after that the FBI

4   commenced its investigation and he remained on parole then up

5   until March of 2011 when the state violated his parole

6   immediately after the FBI executed its search warrant.

7           So he was out on parole during not long before the

8   FBI had commenced its investigation, months, within months.

9           THE COURT:  Counsel, does that sound right?

10          MR. MUAWAD:  It does sound right.  He's just

11  confirmed with me that he was on parole for two years prior to

12  March 2001 (sic) which would tie in --

13          THE COURT:  2011?

14          MR. MUAWAD:  -- 2011, excuse me, which would tie in

15  with the '08 activity, and then they revoked his parole in March

16  of 2011 and kept him until June of 2011.  That's right, your

17  Honor.

18          THE COURT:  All right.  Fine.

19          Well, this information has to be gathered quite

20  quickly in order to afford a prompt detention hearing so once in

21  a while there are gaps --

22          MR. MUAWAD:  Sure.

23          THE COURT:  -- and I appreciate you both filling in

24  on that.

25          MR. MUAWAD:  Yeah, no problem, your Honor.

1          THE COURT:  All right.

2          Now, your opportunity, Counsel, for closing.

3          MR. MUAWAD:  Thank you, your Honor.

4          Eighty percent of this detention hearing has to do

5    with these alleged terroristic activities, and what we haven't

6    heard today, Judge, is whether or not what he did was illegal

7    under any statute in the United States

8          There's activity of him going on the computer and

9    doing some stuff with subtitles and looking at propaganda

10   websites, but under 18 USC 2339(B)(I), the mere exercise of

11   rights guaranteed under the First Amendment of the United States

12   does not constitute material support.

13         And this is not a case where my client was training

14   in any way for Jihadist activities.  He did not ever fly to the

15   Middle East or to Somalia to train or to carry out any conspiracy

16   with any known terrorist groups.

17         He was not trying to build a bombast video.  He

18   certainly was not carrying out the activities that the two other

19   gentlemen, Begolly and Chesser, were carrying out which is very

20   extreme and comes to the level of material support.

21         And the fact that Washington, DC, hasn't decided what

22   they're going to do with my client, kind of leads to a testament

23   as to whether or not what my client was doing is a First

24   Amendment right or whether or not it violates any offense under

25   our United States statutes.

1          So I would state that I'm hoping the Court lends very

2   little weight, if any weight, to these issues because really it's

3   a gray area as to whether or not what he was doing was First

4   Amendment protected or material support.

5          But I think the fact that he hasn't been indicted nor

6   has there been a complaint nor has Washington made up their mind

7   on what they're going to do with him, I'm hoping the Court does

8   not consider this as a factor for detention.

9          Now, regarding the factors under 18 USC 3142(g), the

10  nature and circumstances of the offense charged including whether

11  the offense is a crime of violence, it is a crime of violence but

12  it's not your typical crime of violence with a gun or a knife or

13  a rape or something like that.

14         I would characterize it as dumb, there's no question

15  about that, if the facts turn out to be the facts, but the weight

16  given to that first count probably is going to be given against

17  my client, but as far as the severity of it I just don't weigh it

18  to the category whether or not a gun was used or something else.

19         Roman Numeral Two or Section Two talks about the

20  weight of the evidence against the person.

21         Well, on the negative side he did allegedly use his

22  car to back up and was heading in the direction of an FBI agent

23  who did a maneuver and went around him.

24         But what's tell-taling of whether or not he was

25  really intending to hurt this person is when they were sitting

1    there for a minute or two minutes he didn't do anything.

2              He could have gotten out of the passenger side of the

3    car.  He could have tried to fight the agent.  He could have

4    tried to do something.  He could have tried to maneuver his car

5    and go in front of the agent's car and try and back up and again

6    like a road rally, and that just never occurred.

7              I think that goes to some weight that he wasn't

8    trying to do anything serious or in his mind nothing serious

9    against the agent.

10             When you look at the history and characteristics I

11   know you've read the probation or pretrial services report.  He

12   has had in the past marijuana use and some alcohol use but

13   certainly I don't think that issue has really been a prevailing

14   issue in his life in several years if not more.

15             He does have a father who lives in St. Joseph,

16   Michigan.  He's unemployed but he's on unemployment.  That's part

17   of his financial resources.  He's lived in St. Joe most if not

18   all of his life.  He's got community ties again to his father and

19   stepmother.

20             And regarding his criminal history he has obviously

21   the problems in 2003, I believe, and some in 2005 that have to do

22   with possession of marijuana.  He has the one resisting in 2005

23   but I don't know the facts surrounding that circumstance.

24             And then he was not on probation or parole when this

25   incident occurred, the complaint was filed.  He was off of parole

82

1   for the MDOC and he was not on any type of probation nor was he

2   pending trial.

3              The other thing I think helps me argue this.  Yes, I

4   was contacted to tell Mr. Berry, look, you're on the "no-fly"

5   zone (sic).  Don't go to the airport and fly out.

6              And some people actually would have said, I don't

7   care what the FBI says, we're going to go and try it anyway.  He

8   didn't.  He stood down and he stayed in his house and he didn't

9   go and I think that's a testament to the fact.

10             The issue of argument he was going to England, yeah,

11  he was going to England to meet and spend time with his religious

12  wife.  Again, there's been no testimony he said to the FBI, hey,

13  I'm leaving, you know, United States, I want to leave so I don't

14  get indicted or so that if I do get indicted, you know, they

15  can't touch me.

16             And that's -- he was going there to fly to see this

17  girl, no question about that.  And he had a ticket there and a

18  ticket back.  It wasn't a one-way ticket.

19             So I don't think there's been any indication as far

20  as a flight risk; that what he did going to England was an

21  attempt to be a flight risk to avoid any prosecution of potential

22  future charges.

23             I think basically he knew about what was going on.

24  He, in his mind, did not know when these charges were going to

25  come down, if ever, and he decided it was time to get kind of a

1   new window of opportunity to get a new life somewhere possibly.

2   Whether England would have been it or not, I don't know.  I can't

3   believe they would have let him stay there on a visa for more

4   than six months but that would have been England's problem.

5              Other than that I don't think he's a flight risk.  I

6   think you have a situation when you take away all of the

7   controversy concerning whether he was carrying on a First

8   Amendment right or whether it's really a material support to

9   terrorism.

10             When you look at everything else I think that I'm

11  asking the Court not to detain him.  The Court could put him on a

12  tether.  The Court could just let him stay in his father's house

13  doing what he's doing.

14             Obviously, the precipitation for this was

15  surveillance.  I'm not saying that the FBI didn't have the right

16  to do surveillance.  I'm not saying they didn't have the right to

17  do what they were doing in any way.  But the fact is is prior to

18  the surveillance he had no forcible contact with the FBI even

19  though he knew that there were two warrants executed and he knew

20  that there was potential indictments that may have come down on

21  him.

22             So the Court looks at all the factors, the

23  circumstances, the umbrella of circumstances.  I'm arguing for no

24  detention.

25             And I don't think he needs to test for seriousness of

1    the danger to any person or the community.  And the reason I say

2    that is that he's never posed, prior to surveillance, any risk to

3    the community.  He's never harmed anybody in the neighborhoods or

4    in St. Joe area or any person at all.

5           I think what precipitated this was just a lot of

6    frustration and anger over being followed.  And I'm not telling

7    you that if the facts come out to be the way they are that he did

8    the right thing, but as far as detention is concerned this is --

9    I don't think it applies and I think that he will abide by

10   whatever bond conditions that the Court gives him.

11          Thank you.

12          THE COURT:  Thank you, Counsel, for your remarks.

13          Well, the issue before the Court is whether the

14   government has shown by a preponderance of the evidence that no

15   condition or combination of conditions will assure the presence

16   of the defendant for future court proceedings and/or whether

17   they've shown by clear and convincing evidence a higher standard

18   that there are no conditions or combination of conditions that

19   will assure the safety of the community.

20          There is no presumption in effect in this case.

21          The Court has heard a lot of testimony about

22   activities the defendant may or may not have been involved with

23   in regard to subtitling videos and being on certain invitation-

24   only websites that may or may not be involved with terrorism.

25          I think we ought to make it clear that the Court is

1    not asked today nor is the Court determining whether or not the

2    defendant committed any criminal activity in any of those

3    circumstances nor is the Court adjudicating in any way the

4    defendant's First Amendment rights that he may or may not have

5    had.

6              What I take away from all of that testimony is only

7    that there was an investigation going on and that the defendant

8    knew of that investigation by the FBI and reacted in a certain

9    way or committed the instant matter that leads us here today

10   knowing of this investigation and knowing the FBI was looking at

11   him.

12             So, we're not looking at what the investigation

13   itself shows, only that the defendant was aware of it.  Other

14   issues are for another day.

15             Frankly, I am more troubled by the defendant's

16   criminal history to date and that goes back to when he was a

17   minor.

18             In addition, there have been some problems as

19   reflected in this pretrial services statement about diagnosis

20   with bipolar disorder and involuntary hospitalization or

21   alternative treatment program order issued back in 2005 which

22   reflected that the defendant might harm himself or others and so

23   forth.

24             There was a lot of use of illegal drugs that

25   allegedly has now terminated back as of the summer of 2009, but a

1   lot of that led to the prior criminal history which has numerous

2   instances involving possession of marijuana.

3          Defendant has had medication but he's not previously

4   -- which he's been on previously, substantial medication.   He's

5   not prescribed those at this time.

6          So there is a history here that has a lot of factors

7   in it and it has nothing to do with the matters being

8   investigated by the FBI.

9          And these are what are really before the Court today.

10  And it's not just the charges which are basically possession of

11  marijuana, possession of marijuana, assault, obstruction of a

12  police officer, possession, possession, possession, possession of

13  a switchblade, disorderly person, illegal occupation, and then

14  the most recent one which is again delivery and manufacture of

15  marijuana.

16         But it's the defendant's reaction to those offenses.

17  Specifically going back to 2003 we have a probation -- the

18  defendant was placed on probation but it had to be revoked.   He

19  was subsequently placed on probation again and that had to be

20  revoked.

21         In 2004 defendant was again on probation for another

22  offense and that had to be revoked.

23         In 2005 the defendant violated his bond for reasons

24  that are not stated here but it did result in him serving time in

25  jail.

1          Again in 2005 we have the defendant having been

2    placed on probation for this latest marijuana offense and that

3    probation had to be revoked and the defendant was sentenced to 18

4    to 48 months in prison.

5          He was paroled but that parole was then revoked and

6    he was returned to prison.  He was again paroled and again it was

7    revoked.

8          When a person is being -- asks to be placed on bond

9    or the bond is being considered it's implicit that the Court is

10   placing a certain amount of trust in that individual that he will

11   abide by the conditions of his release, otherwise we cannot

12   effectively have a person on bond.

13         This is a prediction and nobody knows what's going to

14   happen in the future.  Probably even a defendant doesn't always

15   know what he's going to do in the future.

16         But we have to make our best estimate and one of the

17   ways we do that is to look and see how a defendant has behaved in

18   previous similar circumstances, or in other words when he's been

19   under the trust of the Court in previous instances, and here

20   there's been repeated violations that led to probations being

21   revoked and parole being revoked.

22         In short, the defendant has been a management problem

23   and has not abided by these various opportunities to remain out

24   of prison.  And then we couple that with the allegation in this

25   case that knowing the FBI was surveilling him and knowing they

1   were watching but not taking any other action, probable cause at

2   least shows that he attempted to ram an FBI agent's car.

3         Well, that takes a lot of guts.  I think the U.S.

4   Attorney said that was a bold move, an outrageously bold move.

5   Not very many people are willing to do that.  And that shows

6   somebody who is again in effect thumbing his nose at law

7   enforcement and not willing to abide by the kind of conduct that

8   is expected of people in our society and certainly people we're

9   going to place on bond.  It makes management very difficult.

10        Now, the issue of flight here is one of concern

11  because the defendant did obtain a passport and was going to

12  leave the country, by his own statement was going to leave this

13  country permanently.  Clearly, there's some dissatisfaction with

14  the country.

15        Whether he was going to go to Somalia later on or not

16  the indication was he was going to remain away from this country.

17  He's got a wife, a religious wife, over in London and he wanted

18  to go over there and start a new life and so forth.

19        The seriousness of this investigation, seriousness of

20  the resources being thrown at this investigation, I can see the

21  defendant might have some concern about remaining here.  But that

22  makes him a flight risk.  There are other ways to leave this

23  country even if one is on the "no-fly" list I suppose.

24        Whether he's leaving to work with a terrorist

25  organization in Somalia or just going over to be married over in

1   London or England and who knows where after that, he's still not

2   here.  And there's every incentive to leave.  He's attempted to

3   leave.

4          Now, in a couple instances he's shown good judgment

5   in not trying to fly when there's a "no-fly" rule, but why would

6   you attempt to get on a plane if the federal prosecutors called

7   up and said you're on a "no-fly" list.  That just doesn't mean

8   somebody wouldn't try it but that's just making a convenient

9   decision.

10          Nor after staring at each other at this kind of stand

11  off after the attempt to drive into the FBI agent's car, they

12  stare and looked at each other.  He doesn't get out and attack

13  the FBI agent at that point.  Well, that's probably prudent, too.

14          One on one you attack an FBI agent you're probably

15  going to lose.  So that's a common sense decision but that

16  doesn't -- I can't give a person too much credit for that; it

17  just shows they're not stupid, that's all.

18          So I believe the government's made its burden of

19  proof in this case and an order will issue.  Defendant will be

20  ordered detained pending resolution of this matter.

21          MR. FRANK:  Thank you.

22          MR. MUAWAD:  Thank you, Judge.

23          (At 12:42 p.m., proceedings adjourned)

24                          _ _ _ _ _

CERTIFICATE


I, Patricia R. Pritchard, CER 3752, Certified Electronic Court Reporter for the State of Michigan, do hereby certify that the foregoing pages, 1 through 90, inclusive, comprise a full, true and correct transcript, to the best of my ability, of the proceedings and testimony recorded in the above-entitled cause.


September 13, 2012          Patricia R. Pritchard  /S/
                            Patricia R. Pritchard, CER 3752