```
                    UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF MICHIGAN
                        SOUTHERN DIVISION


_____

UNITED STATES OF AMERICA,

          Plaintiff,

     v.                                  File No. 1:11-CR-287

REED STANLEY BERRY,

          Defendant.
_____/


                         Sentencing

Before

              THE HONORABLE ROBERT HOLMES BELL
                 United States District Judge
                      April 19, 2012



                        APPEARANCES



HAGEN W. FRANK                    ELIAS MUAWAD
Assistant U.S. Attorney          36700 Woodward Ave.
P.O. Box 208                     Suite 209
Grand Rapids, MI 49501           Bloomfield Hills, MI 48304
Attorney for Plaintiff           Attorney for Defendant






Kevin W. Gaugier, CSR-3065
U.S. District Court Reporter
```

```
 1                              Grand Rapids, Michigan
 2                              April 19, 2012
 3                              10:40 a.m.
 4                    -    -    -
 5
 6             P R O C E E D I N G S
 7
 8        THE COURT:  Good morning.  The next matter is the
 9   matter of United States v. Reed Stanley Berry.  This is file
10   1:11-CR-287.  Mr. Frank is here representing the United States
11   Attorney's Office.  Mr. Muawad is retained counsel
12   representing Mr. Berry.
13        The parties were here last on December 12th of 2011
14   when a plea was entered to an indictment charging assault with
15   a dangerous weapon against a federal officer, that being an
16   automobile, contrary to 18 United States Code 111(a)(1) and
17   (b).  This plea agreement was accepted at the time of the
18   plea, the Court finding that the charge pled to adequately
19   reflects the seriousness of the actual offense behavior in
20   this matter.
21        A presentence report subsequent thereto was prepared
22   by Mr. Dingwall.  It is some 19 pages in length and I believe
23   has been circulated to counsel.  Does the government have any
24   corrections, additions or deletions?
25        MR. FRANK:  No, Your Honor.
```

```
 1              THE COURT:  Very well.  Mr. Muawad?
 2              MR. MUAWAD:  No, Your Honor.
 3              THE COURT:  Very well.  Have you had a chance, Mr.
 4    Berry, to review this presentence report in this matter?
 5              DEFENDANT BERRY:  Yes, sir.
 6              THE COURT:  Does that presentence report adequately
 7    represent you and your background?
 8              DEFENDANT BERRY:  Yes, sir.
 9              THE COURT:  Are you satisfied with counsel here who
10    is representing you?
11              DEFENDANT BERRY:  Yes, sir.
12              THE COURT:  Very well.  The Court has reviewed in
13    addition to the presentence report a very fine memorandum from
14    defendant's counsel related to this and has reviewed that
15    extensively, and there are a number of family members who have
16    written letters on behalf of Mr. Berry in this case and the
17    Court has read all of them.
18              Are there any matters that should be taken up before
19    allocution, Mr. Frank?
20              MR. FRANK:  Not for the government, sir.
21              THE COURT:  Mr. Muawad?
22              MR. MUAWAD:  No.
23              THE COURT:  You and your client may come to the
24    podium and I will hear first from you and then from your
25    client.  Thank you.
```

1          MR. MUAWAD:  Thank you, Your Honor.

2          One correction that's not pertaining to the

3    presentence report.  In my sentence memorandum I had stated, I

4    believe, on Page 5, the second full paragraph down, that Mr.

5    Berry had found out he was on the no-fly zone.  I was

6    incorrect.  He did not find out that he was on the no-fly zone

7    until after the September 11th weekend that this incident

8    occurred.  For some reason in my mind during the detention

9    hearing I had thought there was some testimony to that and I

10   was wrong, and I confirmed that with my client this morning,

11   and I also told the U.S. attorney that I was going to make

12   that correction.

13          When I met Mr. Berry, I met Mr. Berry at a

14   McDonald's with his father.  I note his father and stepmother

15   are sitting in the back there, and we had many, many talks

16   about the search warrant and issues pertaining to facts that

17   are not in this case, and I don't think anybody could have

18   foreseen what was going to happen on September 11th.  I do

19   know that -- I'm sorry, September 9th, excuse me.  I was

20   saying the September 11th weekend.  When I say September 11, I

21   mean the weekend encompassing the 9th, 10th, and 11th.

22          THE COURT:  Yeah.

23          MR. MUAWAD:  That's when they started surveillance,

24   and I don't think we could have ever foreseen what was

25   happening that weekend.  What I can tell you about is the

1    talks that I've had with Mr. Berry about his future and his

2    plans to get married and do many, many things.

3              THE COURT:  Well, I want to ask about that.

4              MR. MUAWAD:  Sure, Judge.

5              THE COURT:  This love of his wife and on and on

6    about wife, and then I'm led to believe here that she lives in

7    England.

8              MR. MUAWAD:  She does.

9              THE COURT:  There is no marriage ceremony?

10             MR. MUAWAD:  There is in -- there is no marriage

11   ceremony as we think about the formality in the States.  In

12   the tradition, the Muslim tradition, there is a ritual that is

13   not really binding or as formal, but he never got to that

14   point.  When he was trying to fly over there and he found he

15   was on a no-fly zone, I think he was trying to work that out.

16             DEFENDANT BERRY:  It's a verbal agreement.  The

17   marriage happens after.

18             MR. MUAWAD:  Yeah, it was a --

19             THE COURT:  Well, a verbal agreement is not a

20   marriage.  I mean, she --

21             DEFENDANT BERRY:  Well --

22             MR. MUAWAD:  Hang on.

23             THE COURT:  Excuse me.  Excuse me, sir.  I'm using

24   American law.  I'm not using somebody else's law.  So --

25             MR. MUAWAD:  Right.  Right.

 1              THE COURT:  A person may love somebody and they may

 2    intend to marry them and they're called fiancees.

 3              MR. MUAWAD:  Right.

 4              THE COURT:  I think that's what they're called.  A

 5    lot of people have fiancees indefinitely, but be that as it

 6    may, this apparently was his intention to get married.

 7              MR. MUAWAD:  Yes.  Yes, sir, that's correct.

 8              THE COURT:  Is that a better interpretation than

 9    wife in this case?

10              MR. MUAWAD:  Yes, sir.

11              THE COURT:  All right.  Continue on.  Thank you.

12              MR. MUAWAD:  In his mind he considered her his wife,

13    but not an official wife or fiancee, whatever you want to call

14    it, but I agree with you.

15              THE COURT:  Well, the problem is his reality may not

16    be everybody else's reality, and I've been back and forth as I

17    read everything here trying to figure out whose reality we're

18    talking about here.

19              MR. MUAWAD:  I see.

20              THE COURT:  And I'm troubled by his reality and I'll

21    talk about that in a moment.

22              MR. MUAWAD:  Fair enough.

23              THE COURT:  But if you can stay on my reality, okay?

24              MR. MUAWAD:  Absolutely.  Absolutely, Judge, and I

25    do agree with you there was nothing formal.

1          THE COURT:  Thank you.

2          MR. MUAWAD:  Anyway, on the date of the incident, as

3   you know, he was being surveilled due to the concerns by the

4   FBI, and Mr. Berry did know that the police were surveilling

5   him.  I don't think there's any question about that.  Whether

6   he knew it was the actual FBI or a task force, I don't think

7   he knew that.

8          But he has told me on a number of occasions, Judge,

9   and I know that the presentence report at the beginning

10  reflects possibly the opposite, but he knows that what could

11  have happened that day is he could have been shot.  The agent

12  legitimately could have pulled his weapon out and shot him.

13         But not only that, he admits the fact that he did

14  put the agent in jeopardy.  You can't, if you believe you're

15  being surveilled and know you're being surveilled in this

16  world in our life here in the States, you can't put your car

17  in reverse and attack a police officer.  I think he said in

18  Paragraph either 35 or 37 of the presentence report that he

19  did feel bad for the agent, that he was remorseful, and he has

20  told me from the get-go even prior to the plea that he was

21  remorseful.

22         He had plans.  I mean, he had plans to try to fly

23  over to England and live a life possibly there or move back

24  here, maybe bring, if he is married, bring his fiancee or the

25  person that he loved back here.  His plans were to continue

1    his hunt for a job.  His father, you know, has been very

2    supportive of his son.  It's his son, and he has a very good

3    relationship with him.

4            But there's no question that when you look, and Reed

5    will tell you, Mr. Berry will tell you that his past criminal

6    history, you know, with the marijuana charges and then, you

7    know, the hanging around with the wrong friends, obviously,

8    and picking up the felony with the state court, doing 18

9    months, he will tell you that in his opinion that's the old

10   Reed Berry.  He's going to make a statement to you that he was

11   in his mind on his way to trying to get back in the normalcy

12   of life.

13           I don't believe, Judge, that he had any drug problem

14   during the time of this incident, nor was he smoking weed or

15   doing anything to the contrary.  I think the facts will show

16   and he'll state to you that he was on his way to becoming

17   drug-free and getting rid of that nonsense that he had prior

18   to the arrest.

19           What I can tell you about Mr. Berry in my personal

20   viewpoints, for whatever it's worth, is that he's highly

21   intelligent.  I think that I've had a couple talks with the

22   U.S. attorney and he has some knowledge that I'm not as

23   familiar with on the computer, but he has, and I think

24   everybody would agree with this, this man has a future if it's

25   channeled in the right direction.  Whether it's computers,

1    legitimate computer use or starting his own business, whether

2    it's living crime-free, he's got that potential.  I know that

3    before he was arrested it seems like he was heading in that

4    direction, and he has told me on more than one occasion that

5    he feels bad and is remorseful.

6         We've had talks not only at the White Cloud jail,

7    but talks prior to him getting arrested about the other issues

8    that could cause him problems.  We don't know if that's ever

9    going to come back to haunt him.

10         The fact of the matter is he's here for sentencing.

11   We know what the guidelines are.  There's no objection to

12   them.  We know they are recommended guidelines and they're

13   there based upon the factors stated in our, you know, rules of

14   criminal procedure, rules of criminal law, that you have to

15   follow those factors.  I'm hoping the Court will consider a

16   deviation under the recommended guidelines.  You know, I'm not

17   here to -- I could put a recommendation, but it's really not

18   my choice to give you that recommendation.

19         In my mind, Judge, what he did was wrong.  There's

20   no question.  I think that, you know, he could have been shot

21   and killed, like I said, and he could have hurt the agent.

22   And I think the Court probably has to give a sentence that

23   makes a lesson out of somebody that does that, especially the

24   police officers or marshals.

25         But I'm hoping the Court when looking at all the

 1   mitigating circumstances and looks at the fact that the

 2   frustration -- no excuse.  I'm not sitting here and telling

 3   you that frustration equates into committing a crime.  But I

 4   do hope the Court will consider the fact that it's a situation

 5   that he knows he put himself into, an isolated situation in my

 6   opinion, and that the recommended guidelines are high because

 7   of his prior criminal history, but I'm hoping that the Court

 8   will consider a deviation under the guidelines.  I've tried to

 9   put another side to Mr. Berry based upon some of the letters

10   and other things stated in my sentence memorandum, but at this

11   point in time I'm hoping the Court will go under the

12   recommended guidelines.

13           THE COURT:  Thank you.  Thank you.  Thank you, Mr.

14   Muawad.

15           Mr. Berry, is there any statement you would wish to

16   make at this time?

17           DEFENDANT BERRY:  Yes, sir.  I prepared a statement

18   that I'd like to read if that's okay with you.

19           THE COURT:  Very well.  Very well.

20           DEFENDANT BERRY:  Your Honor --

21           THE COURT:  You can pull that down.

22           DEFENDANT BERRY:  Down?  Is that good?

23           THE COURT:  Yeah, that's good.

24           DEFENDANT BERRY:  Your Honor, respected judge, I

25   want to make this statement today on the day of my sentencing

1      for a number of reasons.   It is a combination of personal

2      culpability, accepting responsibility, a plea for leniency,

3      and a number of requests.   I hope that I will be able to earn

4      your coveted attention for a brief moment.

5              Considering the main source of information about me

6      that you possess is my Presentence Investigation Report, I

7      would argue that what you know about me is of a negative

8      connotation, and rightly so.   I'm not only regretful of my

9      past criminal behavior, but at points, but at -- but at points

10     consumed with the deep feeling, deep feeling of remorse, a

11     deep feeling of remorse that for some time in my life it was

12     one of trouble and heartbreak for my family, a violation of

13     the laws and standards of society, and a detriment to an abuse

14     of my own self.

15             I understand the wisdom and purpose behind the

16     Presentence Investigation Report in helping you to determine a

17     sentence according to the sentencing guidelines which will

18     mete out an appropriate punishment for the crime I committed

19     and to help establish respect for the law and the preservation

20     of a stable and secure society.   I have nothing but admiration

21     for the purpose of this endeavor, and I'm not seeking to

22     debase its inherent value.

23             However, many aspects of the PSI describe someone

24     who no longer exists.   I say in all honesty and sincerity that

25     I have changed my life for the better and the way of life

embodied in the PSI is something relegated to my past, and I
can say that in total confidence.  Anyone who truly knows me
amongst my family and loved ones can testify to this reality.
And when you weigh your decision and judgment in regards to
me, I would ask that you please consider the character letters
written on my behalf to help you formulate a more fair
perception of who I am in contrast to the PSI.

I have made the conscious decision and choice in my
life to exert my utmost effort to dedicate my life to God in
the way that I understand him after living a life detached
from him.  Through my journey to gain a nearness to him, I've
shed the trappings and pitfalls of my previous life, embracing
a choice to abide by the law, abstain from intoxicants, become
engaged to get married, seek and obtain employment, and
further my education when possible.  Five years ago I never
would have believed, nor the people around me, that this would
be my mind-set.

While on parole I successfully completed an 18-week
drug program.  I was never violated for a dirty urine or
failed a breathalyzer test.  I participated in multiple
training courses from landscaping to energy-efficient
construction, receiving certification in all programs after
successful completion.  I attended courses at a local
community college and would love the opportunity to continue
my education.  I actively sought employment in various fields

1   and successfully obtained a position at a lodge and retreat,

2   fulfilling many roles from hosting weddings to constructing a

3   wheelchair ramp from scratch.

4           On more than one occasion I was described by my

5   parole agents as a model parolee.  My employer related to me

6   that once my parole agent called her to check up on me,

7   describing me to my employer as one of her best parolees,

8   making a comment that she, quote, never even heard me cuss.

9   Another of my parole agents only had me visit her office once

10  every two months, describing my current status as being on

11  parole as a waste of her time.  She even contacted her

12  superiors in Lansing to have me just discharged from parole,

13  but her request was rejected for unknown reasons.

14          My family can also vouch on my behalf the continued

15  transformation my life has taken in many aspects, from kicking

16  a drug habit to adopting a whole new circle of friends, doing

17  positive things in their lives and community.  You only need

18  to make reference to some of the observations contained in the

19  character letters they have written.  I'm forever thankful to

20  them for the cherished love and unwavering support and

21  encouragement.

22          Having said that, I want to continue on this path of

23  seeking to do the right thing in my life by accepting

24  responsibility for the crime I have committed.  The decision I

25  made was rash, irresponsible, and potentially dangerous.  I

1   allowed my intellect and higher self to be overridden by the

2   base emotions of anger, anxiety, and ill intent.  My actions

3   could have resulted in personal injury to the special agent

4   and possibly even myself which displayed a blatant disregard

5   for life and property.

6           Furthermore, I impeded the special agent from

7   fulfilling his duties which was his job combined with his

8   greater responsibility of serving this country and exerting

9   his efforts to keep it safe.  I feel nothing but regret for

10  what I did, and if the agent is here now, I hope that he has

11  the capacity to forgive me for my transgression against him.

12  I personally wish I could tell him face-to-face that I

13  don't -- that I don't -- that I don't hate him or harbor ill

14  feeling -- excuse me.  I don't hate him or harbor ill feeling

15  toward him nor did what I did because of who he is.

16          I pray that I will have the opportunity to right my

17  wrong and fully earn the fulfillment of my debt to society

18  because of my actions.  I'm prepared to accept the

19  consequences of my actions whatever that is to be.

20          In light of all this, I'm asking if the Court would

21  afford some leniency towards me in my sentence.  Having fully

22  comprehended the sentencing guidelines, I feel that some of it

23  over-represents some of my criminal history which is rife with

24  personal drug use and simple possession.  The only felony on

25  my record is the distribution of three grams of marijuana for

1    which I was sent to prison.  My criminal history is a category

2    VI not because of felonies related to violence or firearms,

3    but due in part to four misdemeanor possessions of marijuana

4    whose total street value doesn't even approach $100.

5            I understand the function of the sentencing

6    guidelines and the purpose they serve to mete out consistent

7    punishments and eliminate sentencing disparities.  But I feel

8    that it can't take into account the fact that I was an

9    individual with a drug problem, immature, who was struggling

10   to find a direction in life.  Unfortunately, this led to

11   becoming entangled in the criminal justice system from my

12   frequent marijuana use and possession.  I implore the Court to

13   please take into consideration that a majority of my criminal

14   record is constituted of petty drug crime that was accumulated

15   within a relatively short period of time in contrast to the

16   larger segment of my life which has been crime-free.  I am not

17   someone who has lived a life of crime from childhood to the

18   present, and I have exerted my utmost to redeem myself after

19   having lived outside the confines of the society's rule of law

20   and the standards it requires of a citizenry for a brief time

21   in my life.

22           I reiterate that whatever this sentence the Court

23   wishes to impose, I accept the consequences and ramifications

24   of my own actions.  I will complete successfully any term of

25   supervised release if it is imposed upon me as I sincerely

1    wish to abide by all its conditions and stipulations.  If a

2    fine is imposed upon me, I make the request that the Court

3    vacate the payment of the fine until I am released from

4    custody.  I have no qualms about paying any form of

5    restitution, but I wish if I'm able to alleviate the financial

6    burden placed upon my family due to my imprisonment.

7            Before I end, I feel like I must say something to

8    the presiding judge, as I feel I have to do it for my own

9    soul.  Whatever sentence you impose upon me today, I want you

10   to know that I feel no animosity towards you nor harbor any

11   ill will.  Whether that even matters to you, I'm not sure, but

12   I felt an overwhelming desire to express this sentiment

13   towards you.  Too often this world is consumed with negativity

14   and hate, and I refuse to allow myself to be someone who

15   entertains disdain for you just for doing your job and

16   fulfilling your duties the best way that you know how,

17   especially when it has been my own criminal behavior which has

18   placed me in the situation that I am today.

19           Whatever happens beyond completion of my statement,

20   I wish success and happiness to you, the prosecutor, and

21   anyone within the FBI who was involved in this case.  Thank

22   you for your time.

23           THE COURT:  Thank you.  Thank you, sir.  Remain

24   there at the podium if you would.

25           Is there anything you wish to say, Mr. Frank?

1          MR. FRANK:  A few comments, Your Honor.

2          First I'd like to address two things that are stated

3    in defendant's sentencing memo, and these are comments about

4    the larger investigation in this case where the defense says

5    that the conduct under investigation is First Amendment

6    protected and asks the Court not to consider claims by the

7    government about the larger investigation.  I just want to

8    state and make it clear for this record that from government's

9    perspective the larger case is not what we're here about

10   today.  Whether that larger investigation eventually results

11   in charges remains to be seen, but that will be for another

12   day, and the government is not asking the Court to consider

13   the overarching matter under investigation that led to the

14   defendant being under surveillance over the weekend of 9/11.

15   So there are no government claims about that larger

16   investigation beyond the fact that it was ongoing and that

17   defendant knew about it, and that it's significant because of

18   what it says about his state of mind when he put his car in

19   reverse and tried to ram Special Agent Sam Moore while that

20   agent was on duty.

21          If we look at this case, the defendant knew that he

22   was under investigation because there was a search warrant

23   executed back in March of 2011.  He knew it was the FBI

24   investigating him, and he knew what the investigation was

25   about.  So on the weekend of 9/11 he knew that it was the FBI

1   that was surveilling him, and in spite of that, in spite of

2   this whole constellation of factors, he got mad and tried to

3   ram an FBI agent on duty in his vehicle, and that's troubling

4   for a couple of reasons.

5          First off, in isolation it doesn't matter whether

6   someone gets aggravated because they're being surveilled or is

7   angry.  I mean, so what?  People do not get to try and ram

8   federal law enforcement agents who are on duty.  So in

9   isolation we think this is a very serious offense.

10          But in context the defendant said something during

11   his allocution that struck me.  He said that the conduct

12   summarized in the presentence report, I believe the phrase he

13   used was relegated to the past.  Well, I know that Your Honor

14   is in the habit of very carefully reading each PSR, and the

15   Court may recall that in Paragraph 51 of the presentence

16   report there's a reference to defendant being in a fight with

17   local law enforcement.  Now, granted, that was some time ago,

18   but the fact remains that this is that same sort of conduct

19   again.  He gets mad at law enforcement and he lashes out at

20   law enforcement.

21          So the notion that all of that stuff in the

22   presentence report is relegated to the past, not necessarily.

23   In the government's view, his conduct in this case kind of

24   pulls that skeleton back out of the closet and makes it

25   current again.

1          In this case, Your Honor, the FBI obviously was not
2    conducting surveillance because they were bored or were out on
3    a lark or looking for something to do.  I'm sure Special Agent
4    Moore would rather have been home late on that Friday night.
5    Instead, he was on duty performing his job and surveilling the
6    defendant when the defendant lost his temper and lashed out at
7    the agent.
8          And again, even if being under FBI surveillance is a
9    stressful experience, his freedom of movement was not
10   restricted in any way.  He was free to go wherever he wanted
11   to go and to engage in whatever legal activity he wanted to
12   do.  He just got mad, and that's no kind of excuse for what he
13   did.
14          So from the government's perspective, Your Honor,
15   the sentencing factors that loom large or the sentencing
16   considerations in this case are the need to deter this
17   defendant to get it through his head once and for all that you
18   don't fight law enforcement to deter him, to deter other
19   people who might think they have some justification for
20   lashing out at law enforcement, and then we'd also ask for a
21   sentence that will reflect the seriousness of this crime, this
22   offense of conviction.  Thank you.
23          THE COURT:  Thank you.
24          This matter carries an adjusted offense of 23 and a
25   criminal history level of VI in this matter.

1          Let me see if I understand this.  Paragraph 51 does

2     discuss something about eight years ago, I guess, or somewhere

3     around that where there was a fight with a police officer.

4     This does in Paragraph 54 describe a borrowed knife with a

5     five-inch blade that apparently was involved in a matter that

6     involved the police and there was an arrest and whatever.  And

7     then in Paragraph 55 there was -- apparently this was

8     involving -- it's a local disorderly conduct case in St. Joe

9     County, but apparently involved a jail situation where it was

10    learned that an individual was going to use a sharpened

11    toothbrush to stab another inmate, and it was found that Mr.

12    Berry was the person in possession of that.

13         More importantly, there was a discharge of Mr. Berry

14    from the Michigan Department of Corrections back here on June

15    26th of 2011 into parole at the time.  That's not very long

16    ago.  And so we have an individual coming out, a marked

17    underachiever for which -- let's make the record very clear.

18    This Court has so many people coming before it, it doesn't

19    have any animus toward anybody.  It's just doing its job.

20         But here's an underachiever, a marked underachiever

21    who has very little work record by virtue of the number of

22    occasions he has been incarcerated.  Nine previous criminal

23    convictions, eight misdemeanors and a felony.  Significant use

24    of alcohol and drugs with this violence this Court has talked

25    about.  Mr. Berry has been on supervision four times.  He has

1    violated supervision four times.  So whether this is the old

2    Mr. Berry or the new Mr. Berry, I -- this is the old Mr.

3    Berry.

4           So we look at the nature and circumstances of this

5    offense which potentially could have been very disastrous.  It

6    was undertaken knowingly and intentionally against a federal

7    official.  But this cannot be completely divorced from the

8    other behaviors, from the fact that Mr. Berry was on

9    supervised release.  He did have rather strict controls in

10   where he could go and what he could do while he was on

11   supervised release.

12          Secondly, the history and characteristics here add

13   up to someone who has had significant difficulties adjusting

14   to society.  Call it lawful society, whatever you want to call

15   it.  Significant difficulties coming up to the standards which

16   are minimal standards required of someone living here in the

17   state of Michigan and in the United States.

18          So the seriousness of this offense, the apparent

19   need for greater respect for law and its protections as well

20   as its enforcement, and a just punishment that will provide

21   adequate deterrence and protect the public while at the same

22   time providing some educational and correctional treatment has

23   to be all balanced within these purposes of the federal

24   sentencing statute, 3553(a).  There is a guideline range in

25   this matter of 92 to 115 months that this Court has as well

1   consideration from.

2          Whether there is a variance or a departure from it

3   requires a very careful look at all the facts and

4   circumstances.  This Court believes that there is no reason to

5   work into a variance or a departure in this case by virtue of

6   not only the criminal history level, but the facts and

7   circumstances giving rise to the offense level.

8          So therefore, this Court believes that some lenity

9   should be given despite the fact that Mr. Berry was in fact on

10  parole at the time, but 92 months in the custody of the

11  Federal Bureau of Prisons this Court believes is essential to

12  achieve not only the objectives which we talked about, I

13  talked about just a second ago, but also to give Mr. Berry the

14  chance to receive some mental health assessments and some

15  treatment if indicated.  It appears that in the past Mr. Berry

16  has had the benefit of some mental health therapies and even

17  some drug regimens as part of that, and it would be this

18  Court's desire that obviously those very thorough and careful

19  examinations be conducted, and if in fact there is a need for

20  some assistance in that regard, then I think that would be

21  better, much better for Mr. Berry, and it clearly will be

22  indicated that is what is required by this Court.

23         Secondly, Mr. Berry will be provided with

24  educational opportunity.  This Court is struck with the fact

25  that here is an intelligent individual, intelligent by

1   anyone's calculation.  And when the Court said an

2   underachiever, it meant exactly that, and that is, why is Mr.

3   Berry here?  That's the first question.  Why isn't he at a

4   workplace?  Why isn't he doing something productive in the

5   community?  Well, that's all part of this history question

6   that we have in front of us and potentially maybe some mental

7   health issues.  But I want some educational attainment to be

8   had in this matter.

9          In fact, Mr. Berry, as part of your stay there, I

10  want to hear from you.  I want to hear what you are learning

11  or what courses you're taking and what you're doing to make

12  yourself not only employable, but what you're doing to make

13  yourself a better member of the community.  Vocational

14  opportunity, yes, I want you provided with that, but first and

15  foremost I want you to be provided with educational

16  opportunity, and I want to see that that is done in this

17  matter.

18         Thereafter you're placed on three years of

19  supervised release with the standard conditions of reporting

20  and remaining law-abiding.  Now, Mr. Berry, I want to be

21  honest with you, fair with you, and tell you that in the

22  federal courts we take supervised release very seriously.  No

23  fooling around while you're on supervised release.  No getting

24  in trouble while you're on supervised release.

25         You are to report monthly or more often as the

1    probation officer would require.  Initially we'll have testing

2    for drugs, but I want no drugs and I want no alcohol.  I want

3    you to be free of them.  I want you to live a sober life.  And

4    if indicated through the Bureau of Prisons that medications or

5    some other form of -- some other regimen would be of

6    assistance to you in that mental health issue -- and this is

7    not anything to be ashamed about at all; some people just have

8    little issues with regulating -- I want that taken care of in

9    conjunction with your supervised release.

10          No association with any ex-felons or persons in the

11   criminal justice system without the supervised release

12   officer's consent.  I want you to maintain legitimate

13   full-time employment as approved by the probation officer, and

14   if required in a testing and treatment for substance abuse,

15   that you do that.  I don't think it will be.

16          The first 12 months that you're on supervised

17   release, you will be placed on curfew.  From 10:00 a.m. till

18   6:00 a.m. I want you home.  I want you inside unless excused

19   by the probation officer.

20          I'm going to assess a fine of $1,000, but I'm going

21   to waive the interest and I'm not going to require any

22   payments until 60 days after supervised release is commenced,

23   and that's only $50 a month.  Mandatory special assessment of

24   $100 will be required in this matter.

25          Are there any legal objections to be lodged first

 1    from the government as to the sentence this Court is

 2    imposing?

 3              MR. FRANK:  No legal objections, Your Honor.  If I

 4    could clarify one thing for the record, I believe the Court

 5    stated in its discussion of sentencing factors that Mr. Berry

 6    was on parole at the time he committed the offense.  I

 7    double-checked with the agent.  He had completed parole in

 8    June, so when he committed this offense, the offense of

 9    conviction, he was off parole.  With that --

10              THE COURT:  Was he discharged?  I guess I'm unclear,

11    and the officer that wrote the presentence report is not here.

12              MR. FRANK:  Yes, sir.  What happened was that he

13    was on parole when Michigan found out about the conduct under

14    investigation and the fact that the FBI had executed a search

15    warrant.  They revoked his parole, sent him back to prison.

16    He completed service of that final leg in June and was

17    released, and at that point from June until September he was

18    done with the State of Michigan.

19              THE COURT:  All right.  Okay.

20              MR. MUAWAD:  Correct, Your Honor.

21              THE COURT:  Thank you.  That's correct?

22              MR. MUAWAD:  Yes.

23              THE COURT:  Okay.  Very good.  Thank you.  I will

24    make that notation.  That was not clear in the presentence

25    report.

```
 1                    Anything else?

 2             MR. FRANK:  No, sir.

 3             THE COURT:  Okay.  Anything else, Mr. Muawad?

 4             MR. MUAWAD:  Two housekeeping matters, Judge.  When

 5   you set the curfew, did you mean 10:00 p.m. or 10:00 a.m. to

 6   6:00?

 7             THE COURT:  10:00 p.m. to 6:00 a.m.

 8             MR. MUAWAD:  I thought I heard a.m.  I apologize.

 9             THE COURT:  Oh, no, I'm sorry.

10             MR. MUAWAD:  And then would the Court, if eligible,

11   recommend the drug program for him if he's eligible?

12             THE COURT:  Yes, and that's what this assessment is

13   going to be concerning.

14             MR. MUAWAD:  Very good.  Otherwise that's all I

15   needed to say.  Thanks.

16             THE COURT:  Now, I want to say this.  That home

17   confinement and curfew may be with electronic monitoring.  I'm

18   leaving that to the discretion of the supervised release

19   officer.  I think frankly Mr. Berry should be old enough and

20   mature enough that he knows what 10:00 p.m. is and he knows

21   what 6:00 a.m. is and he knows what happens if he's running

22   around the streets.  My grandmother always told me nothing

23   good ever happens after 11:00 at night, and I didn't think she

24   was correct at the time, but I do now.  All right.

25             MR. MUAWAD:  No problem, Your Honor.
```

1          THE COURT:  Anything else?

2          MR. MUAWAD:  Not on behalf of defendant, no.

3          THE COURT:  Okay.  Okay.  You have a right of appeal

4   from this sentence and this conviction.  You have 14 days

5   within which to file that appeal.  Your obligation will be

6   upon counsel to assist you if that is necessary.  You're

7   remanded to the federal marshal for the execution of sentence

8   with the appropriate credits in this matter.

9          Again, thank you, Mr. Muawad, for the representation

10  you've provided in this matter.

11         MR. MUAWAD:  Thank you, Judge.

12         THE COURT:  That's all.

13         (Proceedings concluded at 11:17 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER


I, Kevin W. Gaugier, Official Court Reporter for the United States District Court for the Western District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct transcript of the proceedings had in the within-entitled and numbered cause on the date hereinbefore set forth.

I do further certify that the foregoing transcript was prepared by me.



/s/  Kevin W. Gaugier

Kevin W. Gaugier, CSR-3065
U.S. District Court Reporter
110 Michigan N.W.
622 Federal Building
Grand Rapids, MI 49503